ADOPTED
December 21, 2022

**Resolution Regarding**
**Purchase and Sale & Redevelopment Agreement with Netflix, Inc. for the Mega Parcel in Eatontown and Oceanport**

**WHEREAS,** the FMERA Board approved the Rules for the Sale of Real and Personal Property (the "Sales Rules") at the August 17, 2011 meeting of the Authority. In accordance with N.J.A.C. 19:31C-2.5(a), before advertising a particular parcel of real property and accompanying personal property as being available for sale through the offer to purchase process, the Board shall review and approve a recommendation of the Director and FMERA to offer the property for sale through that process. In its determination to use the requests for offers to purchase process, the Board also may consider various factors including, but not limited to, purchase price, jobs to be created and timing, to determine whether the requests for offers to purchase process will enhance the economic value to FMERA. After the RFOTP is issued and offers are received and negotiated, the Director and FMERA staff shall present a recommendation to the Board to accept an offer, to terminate negotiations regarding offers, or to take other appropriate action; and

**WHEREAS**, the Mega Parcel ("the Property"), is an approximately 292± acre parcel of land containing former residential, administrative and R&D buildings, warehouses, workshops and additional general-purpose facilities in the Boroughs of Eatontown and Oceanport, within the Main Post section of Fort Monmouth. The Mega Parcel is conveniently located adjacent to State Route 35, providing easy access to the Garden State Parkway, Route 18, NJ Transit Bus Lines & adjacent to County Route 11 (Oceanport Avenue), which provides direct access to the Little Silver NJ Transit Train Station. The westernmost 51.1 acres of the Property lie within the Phase 1 area of Fort Monmouth, which requires profit sharing with the U.S. Department of the Army. The remaining Mega Parcel acreage lies within the Phase 2 area of Fort Monmouth; and

**WHEREAS**, the Mega Parcel was appraised by a professional licensed appraiser for $55.04 Million Dollars. As a State entity and in accordance with the Land Use Rules at N.J.A.C. 19:31C-2.14(b), when evaluating purchase price, FMERA must consider the purchase price compared to the appraised value of the property; and

**WHEREAS**, the Fort Monmouth Reuse & Redevelopment Plan ("Reuse Plan") contemplates the redevelopment of Fort Monmouth as a mixed-use campus that creates jobs in high growth industries and further envisions a live-work-play community complete with arts & entertainment, small businesses, cultural & civic uses, retail & restaurant uses, and outdoor amenities such as public plazas & walking trails that complement residential and additional commercial redevelopment. The Mega Parcel would incorporate several "development districts," defined under the Land Use Rules; and

**WHEREAS,** in addition to the goals outlined in the Reuse Plan, the Mega RFOTP aligned with the Governor's strategic priorities to overcome the State's largest economic challenges, as described in the Governor's Economic Plan. FMERA has a strong interest in bolstering the innovation economy to create more and better jobs locally, as well as throughout the state, and to further revitalize Fort Monmouth. By supporting one or more key sectors, including but not limited to life sciences, information and high tech, clean energy, food and beverage, and film and digital media, the Fort will be positioned to serve as a regional hub for one of these dynamic industries and further attract other business within and around the Fort Monmouth area, as a result. In an effort to further support these priorities, the Authority permitted alternate uses other than those within the development districts outlined above, so long as Potential Purchasers could demonstrate how the proposal achieves the highest and best use of the property in accordance with the key sectors and generates associated economic impact. Proposals including alternate uses will require an amendment to the Reuse Plan; and

**WHEREAS,** the intent of the Mega Parcel Request for Offer to Purchase ("RFOTP #1") is to see the Fort redeveloped with a forward-looking and transformative project that aims to meet the highest standards of economic and sustainable development. The Mega Parcel is envisioned as a large, cohesive redevelopment project with integrated commercial and amenity-based uses, along with public spaces that support FMERA's goal of developing a vibrant, walkable community. Under the terms of the RFOTP, proposals could be mixed-use and consider a campus-like approach, inclusive of a variety of uses and amenities that are complementary. Residential uses were also permitted, subject to the terms of the RFOTP; and

**WHEREAS**, in accordance with N.J.A.C. 19:31C-2.5(a), FMERA issued a RFOTP in connection with the planned redevelopment of the approximately 282-acre Mega Parcel in the Boroughs of Eatontown and Oceanport on October 15,

2021; and

**WHEREAS**, during the period in which the Mega Parcel RFOTP #1 was open for proposals, Parkers Creek Partners ("PCP"), the Purchaser of the Bowling Center, notified FMERA on September 7, 2021 that it no longer wished to pursue its Redevelopment Project and did not intend to go forward with the Bowling Center due to challenges in renovating and operating a Bowling Center while facing continued cost increases, delays, and pandemic related public health concerns impacting the operations of a bowling facility. PCP acquired the Bowling Center Property from FMERA by Deed dated March 26, 2021, delivered on March 31, 2021 and recorded on June 11, 2021 in the Office of the Monmouth County Clerk, pursuant to the Purchase and Sale and Redevelopment Agreement dated July 2, 2019, as amended; and

**WHEREAS**, in response to concerns expressed by PCP, FMERA staff monitored and evaluated existing market conditions as the global pandemic continued to have widespread economic impact and still believed the proposed redevelopment plan for the Mega Parcel remained the highest and best use of the Property, however, FMERA recognized that the impacts of the pandemic caused other projects within the Fort boundaries to lose feasibility as standalone projects. FMERA staff concluded that the best and highest use of the Bowling Center would be to include the additional acreage in a new issuance of the Mega Parcel with the flexibility for the Bowling Center to be reused or demolished for other uses; and

**WHEREAS**, at its December 2021 meeting, the FMERA Board authorized a request to repurchase the Bowling Center and to terminate the Mega Parcel RFOTP issued on October 15, 2021, to allow the inclusion of the Bowling Center acreage into a new Mega Parcel RFOTP to further support the highest and best use of the Fort's remaining acreage; and

**WHEREAS**, on March 8, 2022, FMERA issued a new Mega Parcel RFOTP, with the only material change being the inclusion of the approximately 2.8-acre Bowling Center parcel, increasing the overall acreage from approximately 289± acres to approximately 292± acres (the "RFOTP"). FMERA issued RFOTP Addendum #1 on March 10, 2022, Addendum #2 on April 18, 2022, Addendum #3 on May 5, 2022, Addendum #4 on May 11, 2022, and Addendum #5 on May 26, 2022 in response to questions received during the Question and Answer Period. Responses to the RFOTP were due on June 6, 2022. FMERA received four proposals from: Extell Acquisitions, LLC, Mega Parcel Development, LLC, Netflix, Inc. and RDR Partners, LLC; and

**WHEREAS**, on October 14, 2022, pursuant to Section 5.0 of the RFOTP, Extell Acquisitions, LLC, withdrew their proposal and requested their initial deposit be refunded and the deposit was refunded on October 19, 2022. Following a review of required compliance and responsiveness to the material terms of the RFOTP by the procurement coordinator, Mega Parcel Development, LLC was deemed non-compliant for failing to comply with the material requirements provided for in the "Mandatory Historic Considerations" pursuant to Section 1.0. As a part of its proposal package, Mega Parcel Development LLC proposed to improve Greely Field with additional housing, water features, and to relocate the existing historic monuments. As stated in the RFOTP, the relocation of historic monuments is strictly prohibited and permanent improvements to Greely Field, which is slated as deed restricted open space within the historic district, would not be permitted. Further, the proposal lacked clarity with regard to residential unit quantities per Borough and did not distinguish affordable housing unit counts. The proposal also included development within areas designated as landfills, including low density residential and a medical campus; and

**WHEREAS**, the proposals were independently scored and Netflix, Inc. received a score of 5,080 and RDR Partners, LLC received a score of 4,240. The evaluation committee recommended proceeding with negotiations for a PSARA with Netflix, Inc.; and

**WHEREAS**, pursuant to the terms of the PSARA, Netflix (the "Purchaser") will pay Forty-Seven Million ($47,000,000) Dollars for the Mega Parcel. Additionally, Purchaser has agreed to pay a utility contribution of Five Million ($5,000,000.00) Dollars, and the FMERA office relocation fee of Three Million ($3,000,000.00) Dollars. The Total Amount due at Closing shall be Fifty-Five Million ($55,000,000.00) Dollars, subject to any adjustment relative to the Environmental Carve-Out Holdback; and

**WHEREAS**, the Purchaser's total Capital Investment is estimated at Eight Hundred and Forty-Eight Million ($848,000,000) Dollars which shall be allocated between Phase 1 representing Eight Hundred Six Million ($806,000,000) Dollars of investment and Phase 2 representing Forty-Two Million ($42,000,000) Dollars of investment in furtherance of the Redevelopment Project; and

**WHEREAS**, the Due Diligence Period will run for ninety (90) days from the PSARA execution date and may be extended under the Executive Director's delegated authority for two (2) additional thirty (30) day periods to complete the due diligence tests, inspections, and reviews; and

**WHEREAS**, with respect to the Environmental Carve-Out Parcels, Purchaser and Seller agree to deposit Two Million Four Hundred Thirty Three Thousand Seven Hundred One Dollars and Ninety-Nine Cents ($2,433,701.99) of the Purchase Price in escrow at Closing, to be held and disbursed in accordance with the terms of an Environmental Carve-Out Escrow Agreement (provided that if and to the extent one or more Environmental Carve-Out Parcels are included in the Property conveyed by Seller to Purchaser at the Initial Closing, this amount shall be reduced by the amount(s) allocated to such Environmental Carve-Out Parcels and such amount(s) shall be added to the balance of the Purchase Price to be paid by Purchaser at the Initial Closing). Purchaser shall have a separate period of thirty (30) days following the date that FMERA receives title to each Environmental Carve-Out Parcel from the Army; and

**WHEREAS**, the ECP Confirmation Period shall be for the sole and express purpose of confirming any FOST or Final Remediation Document issued with respect to each such Environmental Carve-Out Parcel and shall commence the Subsequent Closing(s) within forty-five (45) days of FMERA's receipt of title. Purchaser shall have the option, subject to Army and FMERA approval, to close title to one or more of the Environmental Carve-Out Parcels at any time earlier than the Subsequent Closing date, as those described in the attached memorandum; and

**WHEREAS**, Purchaser will apply for and diligently pursue the required approvals for the Project. The Approval Period shall be thirty-six (36) months and shall commence upon the later of i) the expiration of the Due Diligence Periods, or ii) the date that the Seller delivers to Purchaser a final non-appealable Reuse Plan Amendment, provided that if the Purchaser fails to deliver a final Conceptual Site Plan within forty-five (45) days of the expiration of the Due Diligence Period, then the commencement of the Approval Period shall be the date the Reuse Plan Amendment would have been delivered had the Purchaser timely deliver the Final Conceptual Site Plan. The Purchaser may request extension(s) of the original Approval Period, under the Executive Director's delegated authority, for two (2) additional three (3) month period(s) which shall be granted if the Seller determines that the Purchaser is diligently and in good faith pursuing All Approvals; and

**WHEREAS**, closing shall occur no later than ninety (90) days after satisfaction of all conditions precedent to closing, including but not limited to the requirements as described in the attached memorandum; and

**WHEREAS**, the Project shall consist of a sustainable and integrated film studio campus which shall be completed in Phases. Phase 1 shall include the construction of twelve (12) soundstages that will range in size from 15,000 square feet to 40,000 square feet each with a maximum interior clear height of 50 feet and a maximum exterior height of 70 feet (the soundstages shall have, in the aggregate, a minimum buildout of 180,000 square feet and a maximum buildout of 480,000 square feet), including associated improvements and uses customary and incidental to the principal film use. The Phase 1 improvements may additionally include, but are not limited to, mill space, production support buildings, office buildings, production services buildings, commissary/cafeteria, basecamp with trailer parking, a helipad, designated space for large temporary or permanent exterior sets (i.e. backlots), swim tank(s) for film production, ancillary surface and/or structured parking, consumer experience centers and/or attractions, retail components (including food and beverage facilities), a theater, a visitor center and/or a hotel, wind or small solar systems, and rooftop solar. As part of Phase 1, Purchaser may renovate and/or reuse one or more existing buildings located on the Property for its proposed use, which may include the FMERA offices, Mallette Hall, McAfee Building, and Expo Theater; and

**WHEREAS**, Phase 2 of the Project shall consist of the development of additional production support space for the film studio campus, such as basecamps and backlots. The Phase 2 improvements may additionally include, but are not limited to, sound stages, mill space, production support buildings, office buildings, production services buildings, commissary/cafeteria, swim tank(s) for film production, ancillary surface and/or structured parking, consumer experience centers and/or attractions, retail components (including food and beverage facilities), a theater, a visitor center and/or a hotel, wind or small solar systems, and rooftop solar. Purchaser may renovate and/or reuse one or more existing buildings located on the Property for its proposed use, which may include Vail Hall Buildings, Artist Barracks, as well as Buildings 276, 277, 279, 280, 281 and 482 in the 400 Area, which shall at minimum cover at least fifty-one (51%) percent of the Developable Acreage within the Phase 2 area of the Project; and

**WHEREAS**, additionally, within two (2) years of Closing and as part of the Project, the Purchaser shall be obligated to: (a) as part of both Phase 1 and Phase 2, demolish all existing buildings on the Property it has not identified for reuse, provided that for buildings located on Environmental Carve-Out Parcels, the date shall be two (2) years from the subsequent closing for the relevant Environmental Carve-Out Parcel; (b) as part of Phase 1, preserve Greely Field and Cowan Park as deed-restricted publicly accessible open space at the Initial Closing, preserve, repair, and maintain the World War II memorial located in Greely Field and the flagpole & plaque located in Cowan Park, which shall not be disturbed, (c) as part of Phase 1 and Phase 2, construct/improve the trail system applicable to each such Phase, and (d) as part of Phase 1 and Phase 2, construct/improve the sidewalk applicable to each such Phase; and

**WHEREAS**, Purchaser further acknowledges and agrees to provide/grant the necessary easements required to continue serving existing, on- and off-site property owners, whether for access or utilities, as further described within the PSARA. Easements not identified in the PSARA exhibit shall be subject to further review and cooperation between the Parties. FMERA additionally agrees to reasonably cooperate with Purchaser in connection with the vacation, relocation, and/or restructuring of roadways impacting the Mega Parcel, at no cost and expense to FMERA; and

**WHEREAS**, Purchaser represents that it will not construct residential units on the Property and will have no obligation to construct affordable housing as part of the Project or be required by FMERA to make a contribution in lieu of construction if, as represented by Purchaser, the Project does not include any residential units. For avoidance of doubt, the Purchase Price includes the Homeless Trust Fund contribution that Seller shall pay for any Homeless Trust Fund obligations as set forth under FMERA's EDC Agreements, based on the sale of developable acreage, as that term in used in the EDC Agreements, at closing; and

**WHEREAS**, Purchaser shall Complete Construction of Phase 1 of the Project no later than forty-eight (48) months from the date of the Initial Closing. Seller may extend the date for Completion of Construction of Phase 1 for two (2) additional periods of six (6) months each, under the Executive Director's delegated authority, provided Purchaser is diligently and in good faith pursuing the Completion of Construction of Phase 1. Purchaser shall Complete Construction of Phase 2 of the Project no later than eighty-four (84) months from date of the Initial Closing. Seller may extend the date for Completion of Construction of Phase 2 for two (2) additional periods of six (6) months each under the Executive Director's delegated authority, provided Purchaser is diligently and in good faith pursuing the Completion of Construction of Phase 2; and

**WHEREAS**, in addition to the delegated authority provided above, the PSARA provides, and requests that the Members grant, the Executive Director with the following delegated authority: (1) in the case of a Force Majeure event extending beyond the twelve (12) month period provided for in the PSARA, the Executive Director shall have the authority to grant up to two (2), twelve (12) month extensions of the Force Majeure event; and (2) in the event Purchaser endeavors to perform production-related activities on the Property prior to the Initial Closing, the Executive Director shall have the authority to enter into a right of entry and/or license agreement to allow Purchaser to commence those activities; and

**WHEREAS**, Purchaser represents that the total New Jersey employment attributable to Purchaser's construction investment at the Project will reach a maximum of Three Thousand Five Hundred and Twenty-Eight (3,528) full-time equivalent jobs. Purchaser represents that thereafter, the total New Jersey employment attributable to Purchaser's production investment at the Property will be a total of One Thousand Four Hundred and Seven (1,407) jobs within twenty-four (24) months of the issuance of the Certificate of Completion of Phase 1 of the Project and an additional total of One Hundred and Twenty-Eight (128) jobs within twelve (12) months of the issuance of the Certificate of Completion of Phase 2 of the Project. Purchaser shall pay a penalty of $1,500 for each job not created within the timelines set forth in the PSARA; and

**WHEREAS**, attached in substantially final form is the PSARA between FMERA and Netflix, Inc. The final terms of the PSARA are subject to the approval of FMERA's Executive Director, Netflix, Inc. and a review as to form by the Attorney General's office. The Real Estate Committee has reviewed the request and recommends it to the Board for approval.

**THEREFORE, BE IT RESOLVED THAT**:

    1.    The Authority approves the Purchase and Sale & Redevelopment Agreement with Netflix, Inc. for the Mega Parcel in Eatontown and Oceanport on terms substantially consistent to those set forth in the attached memorandum and with final terms acceptable to the Executive Director and the Attorney General's Office and authorizes the Executive Director to execute the Amendment.

    2.    This resolution shall take effect immediately, but no action authorized herein shall have force and effect until 10 days, Saturdays, Sundays, and public holidays excepted, after a copy of the minutes of the Authority meeting at which this resolution was adopted has been delivered to the Governor of the State of New Jersey for his approval, unless during such 10-day period the Governor of the State of New Jersey shall approve the same, in which case such action shall become effective upon such approval, as provided by the Act.

**Attachment**
**Dated:  December 21, 2022**　　　　　　　　　　　　　　　　　　　　　　　　　　　**EXHIBIT 2**



**MEMORANDUM**

| | |
|---|---|
| **TO:** | Members of the Board |
| **FROM:** | Kara Kopach<br>Executive Director |
| **RE:** | Purchase and Sale & Redevelopment Agreement with Netflix, Inc. for the Mega Parcel in Eatontown and Oceanport. |
| **DATE:** | December 21, 2022 |

**Request**

I am requesting that the Board authorize the execution of a Purchase and Sale & Redevelopment Agreement ("PSARA") with Netflix, Inc. ("Netflix" or "Purchaser") for the Mega Parcel Property in Eatontown and Oceanport.

**Background**

The Board approved the Rules for the Sale of Real and Personal Property (the "Sales Rules") at the August 17, 2011 meeting of the Authority. In accordance with N.J.A.C. 19:31C-2.5(a), before advertising a particular parcel of real property and accompanying personal property as being available for sale through the offer to purchase process, the Board shall review and approve a recommendation of the Director and FMERA to offer the property for sale through that process. In its determination to use the requests for offers to purchase process, the Board also may consider various factors including, but not limited to, purchase price, jobs to be created and timing, to determine whether the requests for offers to purchase process will enhance the economic value to FMERA. After the RFOTP is issued and offers are received and negotiated, the Director and FMERA staff shall present a recommendation to the Board to accept an offer, to terminate negotiations regarding offers, or to take other appropriate action.

**The Mega Parcel**

The Mega Parcel ("the Property"), is an approximately 292± acre parcel (formerly identified as approximately 289± acres under the first issuance of the Mega Parcel RFOTP) of land containing former residential, administrative and R&D buildings, warehouses, workshops and additional general-purpose facilities in the Boroughs of Eatontown and Oceanport, within the Main Post section of Fort Monmouth. The Mega Parcel is conveniently located adjacent to State Route 35, providing easy access to the Garden State Parkway, Route 18, NJ Transit Bus Lines & adjacent to County Route 11 (Oceanport Avenue), which provides direct access to the Little Silver NJ Transit Train Station. The westernmost 51.1 acres of the Property lie within the Phase 1 area of Fort Monmouth, which requires profit sharing with the U.S. Department of the Army. The remaining Mega Parcel acreage lies within the Phase 2 area of Fort Monmouth.

The Mega Parcel was appraised by a professional licensed appraiser for $55.04 Million Dollars. As a State entity and in accordance with the Land Use Rules at N.J.A.C. 19:31C-2.14(b), when evaluating purchase price, FMERA must consider the purchase price compared to the appraised value of the property.

**Mega Parcel RFOTP #1**
The Fort Monmouth Reuse & Redevelopment Plan ("Reuse Plan") contemplates the redevelopment of Fort Monmouth as a mixed-use campus that creates jobs in high growth industries and further envisions a live-work-play community complete with arts & entertainment, small businesses, cultural & civic uses, retail & restaurant uses, and outdoor amenities such as public plazas & walking trails that complement residential and additional commercial redevelopment. The Mega Parcel would incorporate several "development districts," defined under the Land Use Rules.

In addition to the goals outlined in the Reuse Plan, the Mega RFOTP aligned with the Governor's strategic priorities to overcome the State's largest economic challenges, as described in the Governor's Economic Plan. FMERA has a strong interest in bolstering the innovation economy to create more and better jobs locally, as well as throughout the state, and to further revitalize Fort Monmouth. By supporting one or more key sectors, including but not limited to life sciences, information and high tech, clean energy, food and beverage, and film and digital media, the Fort will be positioned to serve as a regional hub for one of these dynamic industries and further attract other business within and around the Fort Monmouth area, as a result. In an effort to further support these priorities, the Authority permitted alternate uses other than those within the development districts outlined above, so long as Potential Purchasers could demonstrate how the proposal achieves the highest and best use of the property in accordance with the key sectors and generates associated economic impact. Proposals including alternate uses will require an amendment to the Reuse Plan.

The intent of the Mega Parcel RFOTP is to see the Fort redeveloped with a forward-looking and transformative project that aims to meet the highest standards of economic and sustainable development. The Mega Parcel is envisioned as a large, cohesive redevelopment project with integrated commercial and amenity-based uses, along with public spaces that support FMERA's goal of developing a vibrant, walkable community. Under the terms of the RFOTP, proposals could be mixed-use and consider a campus-like approach, inclusive of a variety of uses and amenities that are complementary. Residential uses were also permitted, subject to the terms of the RFOTP.

In accordance with N.J.A.C. 19:31C-2.5(a), FMERA issued a Request for Offer to Purchase ("RFOTP #1") in connection with the planned redevelopment of the approximately 282-acre Mega Parcel in the Boroughs of Eatontown and Oceanport on October 15, 2021.

During the period in which the Mega Parcel RFOTP #1 was open for proposals, Parkers Creek Partners ("PCP"), the Purchaser of the Bowling Center, notified FMERA on September 7, 2021 that it no longer wished to pursue its Redevelopment Project and did not intend to go forward with the Bowling Center due to challenges in renovating and operating a Bowling Center while facing continued cost increases, delays, and pandemic related public health concerns impacting the operations of a bowling facility. PCP acquired the Bowling Center Property from FMERA by Deed dated March 26, 2021, delivered on March 31, 2021 and recorded on June 11, 2021 in the Office of the Monmouth County Clerk, pursuant to the Purchase and Sale and Redevelopment Agreement dated July 2, 2019, as amended.

In response to concerns expressed by PCP, FMERA staff monitored and evaluated existing market conditions as the global pandemic continued to have widespread economic impact and still believed the proposed redevelopment plan for the Mega Parcel remained the highest and best use of the Property, however, FMERA recognized that the impacts of the pandemic caused other projects within the Fort boundaries to lose feasibility as standalone projects. FMERA staff concluded that the best and highest use of the Bowling Center would be to include the additional acreage in a new issuance of the Mega Parcel with the flexibility for the Bowling Center to be reused or demolished for other uses.

Therefore, at its December 2021 meeting, the FMERA Board authorized a request to repurchase the Bowling Center and to terminate the Mega Parcel RFOTP issued on October 15, 2021, to allow the inclusion of the Bowling Center acreage into a new Mega Parcel RFOTP to further support the highest and best use of the Fort's remaining acreage.

**Mega Parcel RFOTP #2**
On March 8, 2022, FMERA issued a new Mega Parcel RFOTP, with the only material change being the inclusion of the approximately 2.8-acre Bowling Center parcel, increasing the overall acreage from approximately 289± acres to approximately 292± acres (the "RFOTP"). FMERA issued RFOTP Addendum #1 on March 10, 2022, Addendum #2 on April 18, 2022, Addendum #3 on May 5, 2022, Addendum #4 on May 11, 2022, and Addendum #5 on May 26, 2022in response to questions received during the Question and Answer Period. Responses to the RFOTP were due on June 6, 2022. FMERA received four proposals from: Extell Acquisitions, LLC, Mega Parcel Development, LLC, Netflix, Inc. and RDR Partners, LLC.

On October 14, 2022, pursuant to Section 5.0 of the RFOTP, Extell Acquisitions, LLC, withdrew their proposal and requested their initial deposit be refunded and the deposit was refunded on October 19, 2022. Following a review of required compliance and responsiveness to the material terms of the RFOTP by the procurement coordinator, Mega Parcel Development, LLC was deemed non-compliant for failing to comply with the material requirements provided for in the "Mandatory Historic Considerations" pursuant to Section 1.0. As a part of its proposal package, Mega Parcel Development LLC proposed to improve Greely Field with additional housing, water features, and to relocate the existing historic monuments. As stated in the RFOTP, the relocation of historic monuments is strictly prohibited and permanent improvements to Greely Field, which is slated as deed restricted open space within the historic district, would not be permitted. Further, the proposal lacked clarity with regard to residential unit quantities per Borough and did not distinguish affordable housing unit counts. The proposal also included development within areas designated as landfills, including low density residential and a medical campus.

The proposals were independently scored and Netflix, Inc. received a score of 5,080 and RDR Partners, LLC received a score of 4,240. The evaluation committee recommended proceeding with negotiations for a PSARA with Netflix, Inc.

**Purchase and Sale & Redevelopment Agreement**
Pursuant to the terms of the PSARA, Netflix will pay Forty-Seven Million ($47,000,000) Dollars for the Mega Parcel. Additionally, Purchaser has agreed to pay a utility contribution of Five Million ($5,000,000.00) Dollars, and the FMERA office relocation fee of Three Million ($3,000,000.00) Dollars. The Total Amount due at Closing shall be Fifty-Five Million ($55,000,000.00) Dollars, subject to any adjustment relative to the Environmental Carve-Out Holdback, as further described below. The Purchaser's total Capital Investment is estimated at Eight Hundred and Forty-Eight Million ($848,000,000) Dollars which shall be allocated between Phase 1 representing Eight Hundred Six Million ($806,000,000) Dollars of investment and Phase 2 representing Forty-Two Million ($42,000,000) Dollars of investment in furtherance of the Redevelopment Project.

The Due Diligence Period will run for ninety (90) days from the PSARA execution date and may be extended under the Executive Director's delegated authority for two (2) additional thirty (30) day periods to complete the due diligence tests, inspections, and reviews.

With respect to the Environmental Carve-Out Parcels, Purchaser and Seller agree to deposit Two Million Four Hundred Thirty Three Thousand Seven Hundred One Dollars and Ninety-Nine Cents ($2,433,701.99) of the Purchase Price ("Environmental Carve-Out Holdback") in escrow at Closing, to be held and disbursed in accordance with the terms of an Environmental Carve-Out Escrow Agreement (provided that if and to the extent one or more Environmental Carve-Out Parcels are included in the Property conveyed by Seller to Purchaser at the Initial Closing, this amount shall be reduced by the amount(s) allocated to such Environmental Carve-Out Parcels and such amount(s) shall be added to the balance of the Purchase Price to be paid by Purchaser at the Initial Closing). Purchaser shall have a separate period of thirty (30) days ("ECP Confirmation Period") following the date that FMERA receives title to each Environmental Carve-Out Parcel from the Army. This ECP Confirmation Period shall be for the sole and express purpose of confirming any FOST or Final Remediation Document issued with respect to each such Environmental Carve-Out Parcel and shall commence the Subsequent Closing(s) within forty-five (45) days of FMERA's receipt of title. Purchaser shall have the option, subject to Army and FMERA approval, to close title to one or more of the Environmental Carve-Out Parcels at any time earlier than the

Subsequent Closing date, provided that (1) Purchaser waives the requirement of a FOST issuance by the Army prior to such accelerated Subsequent Closing, (2) Purchaser shall be deemed to have waived its ECP Confirmation Period with respect to the Environmental Carve-Out Parcel which is the subject of such accelerated Subsequent Closing, (3) FMERA shall not be obligated to assume any environmental liability in connection with any such accelerated Subsequent Closing, (4) the conveyance of title to such Environmental Carve-Out Parcel from FMERA to Purchaser shall occur on the same date, and immediately after, FMERA acquires title to such Environmental Carve-Out Parcel from the Army, and (5) the Parties execute a mutually acceptable agreement or other documentation setting forth the Parties' conditions and obligations with respect to the accelerated Subsequent Closing and the applicable Environmental Carve-Out Parcel(s) following the date of such accelerated Subsequent Closing. Purchaser acknowledges that the Subsequent Closings are not options, but that Purchaser is obligated to consummate each and every one of the Subsequent Closings thereby taking title to each Environmental Carve-Out Parcel.

Purchaser will apply for and diligently pursue the required approvals for the Project.  The Approval Period shall be thirty-six (36) months and shall commence upon the later of i) the expiration of the Due Diligence Periods, or ii) the date that the Seller delivers to Purchaser a final non-appealable Reuse Plan Amendment, provided that if the Purchaser fails to deliver a final Conceptual Site Plan within forty-five (45) days of the expiration of the Due Diligence Period, then the commencement of the Approval Period shall be the date the Reuse Plan Amendment would have been delivered had the Purchaser timely deliver the Final Conceptual Site Plan. The Purchaser may request extension(s) of the original Approval Period, under the Executive Director's delegated authority, for two (2) additional three (3) month period(s) which shall be granted if the Executive Director determines that the Purchaser is diligently and in good faith pursuing All Approvals.

Closing shall occur no later than ninety (90) days after satisfaction of all conditions precedent to closing, including but not limited to: i) confirmation by both Parties that all conditions precedent to closing have been satisfied; ii) approval of the Purchaser as redeveloper of the property by the NJEDA Board; iii) Purchaser's completion of Due Diligence (except with respect to the Environmental Carve-Out Parcels); iv) the receipt of all Approvals within the timeframes set forth in the PSARA; v) JCP&L shall have fulfilled its obligations under its agreement with FMERA with respect to the delivery of the substation and distribution lines to the Property  intended to service the Project with a minimum of 10MV of power; vi) a written agreement with JCP&L, acceptable to JCP&L and the Purchaser, for up to an additional 33 MV of power; vii) Seller having performed all covenants, agreements and conditions required by the Agreement; viii)  Seller shall have satisfied all conditions relating to the conveyance of fee simple marketable title insurable at regular rates (except with respect to the Environmental Carve-Out Parcels); and ix) Seller shall have approved and delivered a Reuse Plan Amendment for the Property. In the event that JCP&L cannot accommodate the required electric loads for the Project and/or fails to consummate an agreement with Purchaser to provide the required power despite diligent, good faith efforts by the Purchaser in accordance with the timelines set forth in Section 47(q) of the PSARA, Purchaser shall have the right to terminate this agreement and receive a refund of its full Deposit regardless of whether or not the Due Diligence and Approval Period(s) have expired.

The Project shall consist of a sustainable and integrated film studio campus which shall be completed in Phases. Phase 1 shall include the construction of twelve (12) soundstages that will range in size from 15,000 square feet to 40,000 square feet each with a maximum interior clear height of 50 feet and a maximum exterior height of 70 feet (the soundstages shall have, in the aggregate, a minimum buildout of 180,000 square feet and a maximum buildout of 480,000 square feet), including associated improvements and uses customary and incidental to the principal film use. The Phase 1 improvements may additionally include, but are not limited to, mill space, production support buildings, office buildings, production services buildings, commissary/cafeteria, basecamp with trailer parking, a helipad, designated space for large temporary or permanent exterior sets (i.e. backlots), swim tank(s) for film production, ancillary surface and/or structured parking, consumer experience centers and/or attractions, retail components (including food and beverage facilities), a theater, a visitor center and/or a hotel, wind or small solar systems, and rooftop solar. As part of Phase 1, Purchaser may renovate and/or reuse one or more existing buildings located on the Property for its proposed use, which may include the FMERA offices

(Building 502), Mallette Hall (Buildings 1206-1207), McAfee Building (Building 600) and Expo Theater (Building 1215).

Phase 2 of the Project shall consist of the development of additional production support space for the film studio campus, such as basecamps and backlots. The Phase 2 improvements may additionally include, but are not limited to, sound stages, mill space, production support buildings, office buildings, production services buildings, commissary/cafeteria, swim tank(s) for film production, ancillary surface and/or structured parking, consumer experience centers and/or attractions, retail components (including food and beverage facilities), a theater, a visitor center and/or a hotel, wind or small solar systems, and rooftop solar. Purchaser may renovate and/or reuse one or more existing buildings located on the Property for its proposed use, which may include Vail Hall Buildings (Buildings 1150-1152), Artist Barracks (Buildings 1102-1107), as well as Buildings 276, 277, 279, 280, 281 and 482 in the 400 Area, which shall at minimum cover at least fifty-one (51%) percent of the Developable Acreage within the Phase 2 area of the Project.

Additionally, within two (2) years of Closing and as part of the Project, the Purchaser shall be obligated to: (a) as part of both Phase 1 and Phase 2, demolish all existing buildings on the Property it has not identified for reuse, provided that for buildings located on Environmental Carve-Out Parcels, the date shall be two (2) years from the subsequent closing for the relevant Environmental Carve-Out Parcel; (b) as part of Phase 1, preserve Greely Field and Cowan Park as deed-restricted publicly accessible open space at the Initial Closing, preserve, repair, and maintain the World War II memorial located in Greely Field and the flagpole & plaque located in Cowan Park, which shall not be disturbed, (c) as part of Phase 1 and Phase 2, construct/improve the trail system applicable to each such Phase, and (d) as part of Phase 1 and Phase 2, construct/improve the sidewalk applicable to each such Phase.

Purchaser further acknowledges and agrees to provide/grant the necessary easements required to continue serving existing, on- and off-site property owners, whether for access or utilities, as further described within the PSARA and more specifically identified within Exhibit G. Easements not identified in Exhibit G shall be subject to further review and cooperation between the Parties. FMERA additionally agrees to reasonably cooperate with Purchaser in connection with the vacation, relocation, and/or restructuring of roadways impacting the Mega Parcel, at no cost and expense to FMERA.

Purchaser represents that it will not construct residential units on the Property and will have no obligation to construct affordable housing as part of the Project or be required by FMERA to make a contribution in lieu of construction if, as represented by Purchaser, the Project does not include any residential units. For avoidance of doubt, the Purchase Price includes the Homeless Trust Fund contribution that Seller shall pay for any Homeless Trust Fund obligations as set forth under FMERA's EDC Agreements, based on the sale of developable acreage, as that term in used in the EDC Agreements, at closing.

Purchaser shall Complete Construction of Phase 1 of the Project no later than forty-eight (48) months from the date of the Initial Closing. Seller may extend the date for Completion of Construction of Phase 1 for two (2) additional periods of six (6) months each, under the Executive Director's delegated authority, provided Purchaser is diligently and in good faith pursuing the Completion of Construction of Phase 1. Purchaser shall Complete Construction of Phase 2 of the Project no later than eighty-four (84) months from date of the Initial Closing. Seller may extend the date for Completion of Construction of Phase 2 for two (2) additional periods of six (6) months each under the Executive Director's delegated authority, provided Purchaser is diligently and in good faith pursuing the Completion of Construction of Phase 2.

In addition to the delegated authority provided above, the PSARA provides, and requests that the Members grant, the Executive Director with the following delegated authority: (1) in the case of a Force Majeure event extending beyond the twelve (12) month period provided for in the PSARA, the Executive Director shall have the authority to grant up to two (2), twelve (12) month extensions of the Force Majeure event; and (2) in the event Purchaser endeavors to perform production-related activities on the Property prior to the Initial Closing, the Executive

Director shall have the authority to enter into a right of entry and/or license agreement to allow Purchaser to commence those activities.

Purchaser represents that the total New Jersey employment attributable to Purchaser's construction investment at the Project will reach a maximum of Three Thousand Five Hundred and Twenty-Eight (3,528) full-time equivalent jobs. Purchaser represents that thereafter, the total New Jersey employment attributable to Purchaser's production investment at the Property will be a total of One Thousand Four Hundred and Seven (1,407) jobs within twenty-four (24) months of the issuance of the Certificate of Completion of Phase 1 of the Project and an additional total of One Hundred and Twenty-Eight (128) jobs within twelve (12) months of the issuance of the Certificate of Completion of Phase 2 of the Project. Purchaser shall pay a penalty of $1,500 for each job not created within the timelines set forth in the PSARA.

The attached PSARA between FMERA and Netflix, Inc. is in substantially final form. The final terms of the PSARA are subject to the approval of FMERA's Executive Director, Netflix, Inc. and a review as to form by the Attorney General's office. The Real Estate Committee has reviewed the request and recommends it to the Board for approval.

**Recommendation**
In summary, I am requesting that the Board approve the execution of a Purchase and Sale & Redevelopment Agreement with Netflix, Inc. for the Mega Parcel RFOTP in Eatontown and Oceanport.

_____
Kara Kopach

Attachments:   Mega Parcel Purchase and Sale & Redevelopment Agreement
Prepared by:   Sarah Giberson & Regina McGrade