## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CALEB L. MCGILLVARY, | : | |
| Plaintiff, | : | No. 23-cv-22605 |
| | : | |
| vs. | : | |
| | : | |
| NICHOLAS SCUTARI, et al., | : | |
| Defendants. | : | |

## MEMORANDUM

**Younge, J.**                                              **August 12, 2024**

Currently before the Court is a *Motion for Ad Interim Relief Under Substantive Provisions of N.J.C.R. 4:69-3, or in the Alternative for Preliminary Injunction Under Rule 65* (ECF No. 81) filed by the Plaintiff. In his motion, Plaintiff requests entry of a mandatory injunction to prevent the sale and redevelopment of a parcel of land that is nearly 300 acres and was once used as military base in Fort Monmouth, New Jersey. The Court finds this motion appropriate for disposition without oral argument. See Fed. R. Civ. P. 78, L.R. 7.1(f). For the reasons set forth below, Plaintiff's motion will be denied.

## I.    FACTUAL BACKGROUND:

Plaintiff Caleb "Kai" McGillvary is serving a 57-year sentence for first-degree murder. *State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651, at *1-2 (N.J. App. Div. May 12, 2021.) In February 2013, he rose to internet fame as the "hatchet wielding hitchhiker," a moniker he earned by striking Jett Simmons McBride three times over the head with a hatchet after McBride crashed his car into a group of pedestrians and attacked bystanders at the scene. (Amended Complaint ¶¶ 2, 99-100, 129, ECF No. 84.) Three months later, and after gaining media notoriety for viral news interviews and media appearances, Plaintiff was arrested for and ultimately convicted of murdering Joseph Galfy, Jr. – a New Jersey attorney.

*State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651, at *1-2 (N.J. App.

Div. May 12, 2021.)  These events were explored in the documentary entitled The Hatchet

Wielding Hitchhiker, available on Netflix.   (Amended Complaint ¶¶ 2, 99-100, 129.)

Plaintiff brings this lawsuit against 81 named individual Defendants and eleven

unidentified John/Jane Doe or unnamed Defendants.  He asserts sixteen claims – including

RICO, ADA, *Bivens*, Section 1983, intentional infliction of emotional distress, defamation,

infringement on his First Amendment rights, copyright infringement and retaliation – against

many individuals, companies (including Netflix and RawTV), dozens of New Jersey government

officials, Governor Murphy, Senator Scutari, New Jersey District Court Judges, members of the

New Jersey State Legislature and various groups of Defendants.  (Amended Complaint.)

Plaintiff alleged that Defendants engaged in a wide swiping money laundering and bribery

scheme in furtherance of providing Robert Menendez with funding for his political campaign.

Plaintiff alleged that Defendants' racketing activities improperly influenced Netflix Inc.'s ability

to purchase a closed military base in Fort Monmouth County, New Jersey at a price below

market value.  As will be discussed in more detail below, the Amended Complaint also makes

reference to release of a documentary about Plaintiff, entitled The Hatchet Wielding Hitchhiker.

Plaintiff offers The Hatchet Wielding Hitchhiker in support of his defamation and copyright

infringement claims.

**A.      The McBride Incident and Plaintiff's Viral Interviews:**

Prior to being incarcerated, Plaintiff worked as a traveling troubadour and/or professional

street performer.  *People v. McBride*, 2016 Cal. App. Unpub. LEXIS 566, at *22 (Cal. Jan. 27,

2016); https://en.wikipedia.org/wiki/Caleb_Lawrence_McGillvary.  On February 1, 2013,

Plaintiff was involved in a violent incident while hitchhiking with a man named Jett Simmons

McBride in Fresno County, California. (Amended Complaint ¶ 2.) The two men were traveling together after McBride had offered Plaintiff a ride. *McBride*, 2016 Cal. App. Unpub., at *18. McBride – who was under the influence of marijuana that was allegedly supplied by Plaintiff and seemingly having a mental health crisis – drove his car into a group of power line workers. *Id.* at *17. McBride then exited the vehicle and began attacking a man whom he had hit with the automobile as well as a woman who was attempting to provide aid to the individual who had been struck by McBride's automobile. (Amended Complaint ¶ 2.) Plaintiff thwarted the attack by striking McBride over the head three times with his camping hatchet. (*Id.*); *McBride,* 2016 Cal. App. Unpub., at *21. Plaintiff was not charged with any crimes related to bludgeoning McBride. (Amended Complaint ¶ 2.)

Plaintiff was leaving the scene when he was stopped by a reporter and camera operator from KMPH Fox News. (*Id.*) The KMPH journalist proceeded to interview Plaintiff about the incident, and Plaintiff described the events that had occurred which included his use of a hatchet to subdue McBride. (*Id.*) The interview went viral with Plaintiff's colorfully recounted interactions with McBride, stating that he smashed McBride over the head three times with his camping hatchet. (*Id.*)

**B.      Plaintiff's Murder Conviction on May 30, 2019, and Habeas Corpus Petition:**

A few months after he shot to fame, Plaintiff murdered a 74-year-old man in the state of New Jersey on May 12, 2013. *State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651, at *1-2 (N.J. App. Div. May 12, 2021.) On May 16, 2013, Plaintiff was arrested for the murder of New Jersey attorney Joseph Galfy, Jr. after Galfy was found "beaten to death, lying face-down on his bedroom floor." *McGillvary*, 2021 N.J. Super. Unpub. LEXIS 1651, at *1. Plaintiff was convicted of first-degree murder, and on May 30, 2019, received a 57-year

sentence that he is currently serving in a New Jersey prison.  *Id.*; *McGillvary v. New Jersey*, 142 S. Ct. 1685 (2022) (denying cert.).

Plaintiff filed a direct appeal from his criminal conviction to the Superior Court of New Jersey, Appellate Division, in which he raised eight alleged errors on appeal.  (*State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651; affirmed *McGillvary v. New Jersey*, 142 S. Ct. 1685 (2022).  Plaintiff exhausted his direct appellate rights after his appeal was formally closed.  Plaintiff then filed a Habeas Corpus Petition on June 22, 2022.  *McGillvary v. Davis*, No. 22-cv-4184-CPO (Plaintiff's Habeas Petition filed at ECF No. 1).  Plaintiff's Habeas Petition takes the form of a collateral attack on the criminal legal proceedings that led to his conviction in the state of New Jersey.  *Id.*

In his Habeas Petition, Plaintiff asserts two distinct legal errors that he alleges the trial court committed during his criminal murder trial.  *Id.*  First, Plaintiff asserts that the trial court erroneously denied his right to self-representation.  *Id.* page 8.  Second, Plaintiff asserts that the trial court erroneously denied his *pro se* Brady motion without a full and fair hearing.  *Id.* pages 8-15.  Under the first ground for habeas corpus relief, Plaintiff asserts that "the trial court's January 7, 2019, denial of [his] Sixth Amendment right to self-representation was a structural error requiring reversal of [his] conviction through writ of habeas corpus."  *Id.* page 8.  Under the second ground for habeas corpus relief, Plaintiff asserts that the "trial court erred in denying his "*pro se* motion to remedy the destruction of Brady materials" which "deprived [him] of his due process and confrontation rights, in violation of the 5th, 6th, and 14th Amendments[.]"  *Id.* page 11.

Plaintiff's Habeas Petition was assigned to the Honorable Christine P. O'Hearn.  *McGillvary v. Davis*, No. 22-cv-4185-CPO.  Plaintiff filed several motions, including a motion to

recuse the presiding Judge O'Hearn, on December 1, 2023.  *McGillvary v. Davis,* No. 22-cv-4185-CPO (Motion to Recuse filed at ECF No. 32 in the habeas corpus action).  On December 11, 2023, in the case *sub judice*, Plaintiff filed a motion to recuse the Honorable Renee Marie Bumb, Chief Judge in the New Jersey District Court.  (Motion to Recuse, ECF No. 3.)  Plaintiff's various recusal motions were based on the fact that he had sued multiple federal District Court of New Jersey judges as named Defendants in this action including Judge O'Hearn and Judge Bumb.  (Motions to Recuse.)

On January 2, 2023, Third Circuit Chief Judge Michael A. Chagares entered an Order reassigning the case *sub judice* to this Court (Order, ECF No. 5.)  Thereafter, on January 9, 2024, Judge O'Hearn administratively terminated Plaintiff's habeas corpus action pending the resolution of the case *sub judice*.  Judge O'Hearn's Order specifically marked Plaintiff's habeas corpus action "closed until and unless the Court enters an Order reopening the matter."  *David v. Davis,* No. 22-cv-4185-CPO *(*Judge O'Hearn's Order granting administrative termination entered in the habeas action at ECF No. 36).

**C.    The Documentary – The Hatch Wielding Hitchhiker:**

On or about December 13, 2022 or January 10, 2023, Netflix released the documentary The Hatchet Wielding Hitchhiker, which investigates Plaintiff's upbringing, his viral fame, and ultimately his conviction for murdering Galfy.  (Amended Complaint ¶¶ 129, 130, 134.)  Plaintiff asserts various legal theories of defamation of character in connection with the release of the documentary.  (Amended Complaint ¶¶ 129-130.)  Plaintiff alleges, *inter alia*, that the documentary unfairly took into account the version of events advanced by the Union County Prosecutor's Office which had charged him with the murder of Galfy.  (*Id.*) Plaintiff also alleges that the documentary unfairly portrayed events surrounding his February 2013 roadside incident

with McBride.  (*Id.*)  The documentary is also the factual basis for Plaintiff's copyright infringement claim.  (*Id.* ¶¶ 99, 133.)  Plaintiff cites to various artistic works that he purportedly created which he alleges were misappropriated by Defendants Netflix and RawTV.  (*Id.* ¶¶ 133, 134.)

D.   **Sale of Fort Monmouth, New Jersey to Netflix, Inc.:**

Throughout the Amended Complaint, Plaintiff makes reference to the sale of a parcel of land located in Fort Monmouth, New Jersey.  (Amended Complaint.)  It would appear that after several years of negotiations, Defendant Netflix, Inc., entered into an agreement to purchase a parcel of public land that was nearly 300 acres in size which had been used as a military base in Fort Monmouth County, New Jersey.  https://www.njeda.gov/njeda-board-designates-netflix-as-a-studio-partner-continuing-new-jerseys-film-industry-momentum/ (last visited on Jul 14, 2024). Netflix intends to build a state-of-the-art production studio on the ground that was once used as a military base.

In opposition to Plaintiff's motion, Defendants come forward with an affidavit prepared by Kara Kopach, the executive director of Fort Monmouth Economic Revitalization Authority (FMERA).[1]  (Kopach Affidavit, ECF No. 167-2.)  Mr. Kopach avers that the parcel of land was appraised at $55.4 million dollars by a licensed professional appraiser.  (*Id.* ¶18.)  Ms. Kopach also establish a final closing price nearly equivalent to the appraised value at Fifty-Five Million ($55,000,000.00).  (*Id.* ¶26.)

---

[1] FMERA is a New Jersey government authority created by the New Jersey legislature pursuant to authorization under P.L. 2010, c. 51 (N.J.S.A. 52:271-18 et seq).  (*Id.* ¶2.)  The scope of FMERA's authority and mandate are governed by its enabling Act, N.J.S.A. 52:271-18 to 52:271-41 and its rules, New Jersey Administrative Code, N.J.A.C. 19:31C-1.1 to 19:31C-3.28 ("regulations").  (*Id.* ¶2.) FMERA's general mission pursuant to N.J.S.A. 52:271-24 is planning and implementing the redevelopment and reuse of Fort Monmouth, formerly operated as a United States Army Installation.

In this action, Plaintiff seeks to enjoin (or rescind) the sale of the mega parcel of land to Netflix, Inc., based on the theory that the land is being sold at a price below market value in connection with a bid rigging scandal.  (Amended Complaint ¶¶ 99, 101, 132, 141.)  Plaintiff also alleges that the redevelopment plan was adopted and approved despite the fact that it failed to meet certain constitutional and legal requirements like, for example, providing for lower-income housing.  Plaintiff alleges that the Netflix land transaction and revitalization plan was part of a larger conspiracy which Plaintiff refers to in the pleadings as a bid rigging scandal.  It would appear under Plaintiff's narrative of events that he uncovered a broad reaching bid rigging scandal involving public officials, politicians and judges located in New Jersey who committed various illegal acts of corruption, misconduct and impropriety which included improper campaign contributions and money laundering.  (*Id.*)

## II.    LEGAL STANDARD:

Before granting a preliminary injunction, a district court must find that the plaintiff has established four factors:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].

*Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)); see also *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The first two factors are the "most critical," and "[i]f these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of

granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d

Cir. 2017); accord *Fulton v. City of Phila.*, 922 F.3d 140, 152 (3d Cir. 2019).

A preliminary injunction "should not be granted unless the movant, by a clear showing,

carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 (1997).

Plaintiff must bear the "particularly heavy" burden of demonstrating a right to relief that is

"indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d

Cir. 2013); *Pub. Int. Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020).

Because Plaintiff seeks a mandatory injunction that would alter the status quo insofar as

he would like to enjoin the sale of land to Netflix, Plaintiff faces a "particularly heavy" burden.

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 219 n.13 (3d Cir. 2014); see also

*Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory

preliminary injunction that will alter the status quo bears a particularly heavy burden in

demonstrating its necessity.").  When a preliminary injunction is directed not merely at

preserving the status quo but, as in this case, at providing mandatory relief, the burden on the

moving party is particularly heavy.  *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181

(3d Cir. 1976); *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980).  An injunction is mandatory

if the injunction will either (1) 'alter the status quo by commanding some positive act' or (2)

provide the moving party with 'substantially all the relief sought and that relief cannot be undone

even if the defendant prevails at a trial on the merits.' *Coast to Coast Entm't, LLC v. Coastal

Amusements, Inc.*, No. 05-3977, 2005 U.S. Dist. LEXIS 26849, (D.N.J. Nov. 7, 2005); *Pub. Int.

Legal Found. v. Boockvar*, 495 F. Supp. 3d 354, 358 (M.D. Pa. 2020).

### III.   DISCUSSION:

Currently before the Court is a *Motion for Ad Interim Relief Under Substantive Provisions of N.J.C.R. 4:69-3, or in the Alternative for Preliminary Injunction Under Rule 65* (ECF No. 81) filed by the Plaintiff.  In this Motion, Plaintiff seeks to enjoin and restrain the purchase, conveyance, transfer and/or redevelopment project envisioned for the Fort Monmouth military base under the Netflix land deal.  Plaintiff's Motion will be denied because he cannot satisfy any of the four elements used to evaluate whether a preliminary injunction should be issued.

### 1.   Plaintiff Cannot Establish Likelihood of Success on the Merits:

Plaintiff is not entitled to preliminary injunctive relief because he is unable to establish with reasonable likelihood that he will ultimately prevail at trial on his claims associated with Netflix, Inc.'s, agreement to purchase the 300-acre parcel of land in Fort Monmouth, New Jersey.  To satisfy the threshold requirement of likelihood of success on the merits, Plaintiff "must demonstrate that [he] can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not.)  *Reilly*, 858 F.3d at 179.  "On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability, of winning."  While courts accept factual allegations as true, they "will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations."  *Perry v. Gold & Liane, P.C.*, 371 F.Supp. 2d 622 (D.N.J. 2005).

Plaintiff comes forward with no evidence to substantiate the sweeping allegations of misconduct and impropriety that he alleges surround the land deal with Netflix in Fort Monmouth County, New Jersey.  Plaintiff supports his request for injunctive relief with nothing

more than a series of allegations that he asserts in his unverified Complaint and Amended Complaint.  Plaintiff fails to establish how he obtained firsthand knowledge of the facts asserted in either pleading and/or that he has any firsthand knowledge at all about the misconduct or impropriety he alleges occurred.  Plaintiff fails to attach one single exhibit to either of his pleadings or motion for injunctive relief to support his allegations of corruption associated with the land deal.

In opposition to Plaintiff's motion, Defendants come forward with an affidavit prepared by Kara Kopach, the executive director of Fort Monmouth Economic Revitalization Authority (FMERA).  (Kopach Affidavit, ECF No. 167-2.)  Ms. Kopach attests to her belief that the land deal with Netflix and the proposed redevelopment plan were negotiated in good faith and in full compliance with regulations governing the conduct of FMERA operations.  (*Id.* ¶¶6-7.)  Ms. Kopach further attests to her belief that FMERA ensured that all regulatory requirements were followed throughout the procurement process.  Ms. Kopach avers that the parcel of land was appraised at $55.4 million dollars by a licensed professional appraiser.  (*Id.* ¶18.)  Ms. Kopach also establish a final closing price near equivalent to the appraised value at Fifty-Five Million ($55,000,000.00).  (*Id.* ¶26.)

Plaintiff seeks to enjoin a complex reuse/redevelopment plan that took years to negotiate and approve.  Plaintiff's unsubstantiated claims and personal interpretation of the law and/or regulations for the land use plan are simply insufficient to establish that he will likely prevail in his bid to set aside the transaction.

2.      **Plaintiff Cannot Show that He Will Suffer Irreparable Harm if Netflix, Inc. is Permitted to Build a Production Studio on the Parcel of Land in Fort Mommouth, New Jersey**:

Plaintiff fails to make the requisite showing that he will be irreparably harmed in the absence of injunctive relief.  "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno*, 40 F.3d 645, 653 (3d Cir. 1994).  The harm must be likely to occur in the absence of an injunction.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (The preliminary injunction "must be the only way of protecting the plaintiff from harm.").  Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that Plaintiff is entitled to such relief.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

The Court rejects the argument that Plaintiff will suffer irreparable harm for similar reasons that it decided to reject Plaintiff's argument that he would likely succeed on the merits – as analyzed and explained above herein.  In support of his request for injunctive relief, Plaintiff relies on allegations in his Compliant and/or Amended Complaint.  However, Plaintiff fails to establish that he has any firsthand knowledge of a corruption scheme as alleged in the pleadings or any credible evidence to support allegations of misconduct and impropriety.  These pleadings are comprised of a series of unsupported factual assertions made by Plaintiff.  The Plaintiff is unable to establish that he has a connection to the sale of the state-owned land.  Not only has the Plaintiff failed to specify any harm he would suffer if the sale of land goes through, but he has also neglected to provide any basis for such harm.  The Plaintiff's inability to articulate how the

land sale affects him provides strong evidence that he is unable to prove the necessary element of irreparable harm in the absence of injunctive relief.

Plaintiff makes the unpersuasive argument that the Netflix redevelopment plan is unconstitutional, violates N.J.A.C. 19:31C-3.1 *et seq.*, and does not comply with the Fair Housing Act because it fails to require construction of lower-income housing.  Plaintiff's argument is based on his interpretation of the law and facts surrounding the Netflix land deal. Plaintiff makes his strained argument without establishing that he is an appropriate person to represent individuals who need lower-income housing.  Plaintiff is serving a 57-year sentence for murder and is currently housed in a correctional institution as inmate prisoner.

**3.     Balance of Equities and the Public Interest**:

Plaintiff is completely unable to establish that a Court ordered injunction staying the Netflix land deal and redevelopment project would be equitable or in the public interest.  When deciding whether to grant or deny a motion for injunctive relief, the Court may consider the effect on each party of the granting or withholding of the requested relief.[2]  *Winter v. Nat Res. Def. Council*, at 24.  The district court should take into account, when relevant, the possibility of harm to other interested persons from granting or denying the requested injunction, and the public interest.  *Oburn v. Shapp*, 521 F.2d 142, 152 (3d Cir. 1975); *Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).  A plaintiff who seeks preliminary relief must establish, among other factors, that an injunction is in the public interest. *Trump v. International Refugee Assistance Project*, 582 U.S. 571 (2017) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  The public interest analysis for the

---

[2]  The Court consolidates its analysis of the last two factors because "[w]here the government is a party, the last two factors in the preliminary injunction analysis, namely the balance of the equities and public interest, merge."  *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

issuance of a preliminary injunction requires the court to consider whether there exists some critical public interest that would be injured by the grant of such relief.  *Bonner v. Pacific Seafood Group*, 822 F.3d 1011, 1024 (9th Cir. 2016).

The public interest inquiry in deciding whether to grant preliminary injunctive relief primarily addresses the impact on nonparties rather than parties; it embodies the Supreme Court's direction that, in exercising their sound discretion, courts of equity should pay particular regard for public consequences in employing the extraordinary remedy of injunction.  *CTIA - The Wireless Association v. City of Berkeley, California*, 928 F.3d 832 (9th Cir. 2019).  When the reach of an injunction is narrow, limited only to the parties, and has no impact on nonparties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying preliminary injunction; if, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.  *Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009).

Plaintiff is one single individual who seeks to void a massive project.  Plaintiff seeks entry of an injunction to halt the $55 million dollar sale of public land to Netflix and a related redevelopment plan that is projected to create substantial revenue for the Government and citizens.  The sale proceeds would foster economic growth, create jobs, and benefit citizens of New Jersey.  The citizens stand to benefit from economic growth associated with the creation of a state-of-the-art production studio, i.e., increased tax revenue, job creation, and entertainment.  Entry of an injunction and preventing the sale would harm the public by delaying economic progress and stifling investment for an approved redevelopment project which would "negatively impact and prejudice all New Jerseyans."  (*See* Letter from the State Defendants, ECF No. 156

(letter opposing the Plaintiff's request for injunctive relief on grounds that entry of a restraining order would be against the public interest.).

## IV.    CONCLUSION:

For these reasons, Plaintiff's *Motion for Ad Interim Relief Under Substantive Provisions of N.J.C.R. 4:69-3, or in the Alternative for Preliminary Injunction Under Rule 65* (ECF No. 81) will be denied.[3]

**BY THE COURT**:

   /s/ John Milton Younge
Judge John Milton Younge

---

[3] Plaintiff's motion for injunctive relief will be denied without a hearing because Federal Rule of Civil Procedure 65(a), "does not always require a live hearing, and courts [can] rule based on the parties' paper submissions, such as when the issues are strictly legal or the facts are not in dispute." Fed. R. Civ. P. 65, practice commentary; *see also Bradley v. Pittsburgh Bd. Of Educ.*, 910 F.2d 1172 (3d Cir. 1990) (Rule 65(a) does not make a hearing a prerequisite for ruling on a preliminary injunction). Within the Third Circuit, a court may decide a motion for a preliminary injunction on the papers alone "when the facts are not in dispute, or when the adverse party has waived its right to a hearing." *Professional Plan Examiners, Inc., v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984); *see also Williams v. Curtiss-Wright Corp.*, 681 F.2d 161 (3d Cir. 1982) ("It has long been recognized that a preliminary injunction may issue on the basis of affidavits and other written evidence, without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue."). "[A] district court is not obliged to hold a hearing when the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley*, 910 F.2d 1175.