## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CALEB L. MCGILLVARY,                          :
     Plaintiff,                              :    No. 23-cv-22605-JMY
                                             :
     v.                                      :
                                             :
NICHOLAS SCUTARI, et al.,                     :
     Defendants.                             :

### MEMORANDUM (Omnibus)

**Younge, J.**                                    **December 23, 2024**

Currently before the Court are thirteen motions to dismiss Plaintiff's first Amended
Complaint that were filed by moving Defendants.[1]  (ECF Nos. 69, 108, 111, 113, 118, 142, 146,
149, 177, 179, 245, 252, 255.)  The Court finds these motions appropriate for resolution without
oral argument.  See Fed. R. Civ. P. 78, L.R. 7.1(f).  For the reasons set forth below, moving
Defendants' motions to dismiss will be granted, and all claims in the first Amended Complaint
asserted against moving Defendants will be dismissed.  Plaintiff will not be permitted to file an
amended complaint to assert renewed claims against these Defendants.

For clerical purposes, the dispositive motions that are currently before the Court are set
forth as follows:

- A motion to dismiss the Complaint filed by Defendants Stark & Stark, P.C., Robert J.
  Bratman, Deborah Dunn, Michael Donahue, Evan Lide, Bryan Roberts, John A. Sakson
  and Domenic Sanginiti.[2]  (ECF No. 69.)

---

[1] Defendants New Jersey Association of Justice and New Jersey Association of Justice PAC entitled their
motion as a: motion for judgment on the pleadings or in the alternate a motion to dismiss.  (ECF No. 111.)
[2] Upon filing of the Amended Complaint, the Court dismissed as moot the motion to dismiss the
Complaint filed by Defendants Stark & Stark.  Since, Plaintiff filed a response in opposition to their
motion to dismiss, the Court will now address claims raised therein *sua sponte.*

- A motion to dismiss the first Amended Complaint filed by Defendants Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C. (improperly pled as Javerbaum Wurgaft), Gerald H. Baker, Michael Galpern, Francisco J. Rodriguez and Jeffrey Rizika.  (ECF No. 108.)

- A motion to dismiss or in the alternate a motion for judgment on the pleadings filed by Defendants New Jersey Association of Justice and New Jersey Association of Justice PAC.  (ECF No. 111.)

- A motion to dismiss the first Amended Complaint filed by Defendants, Lum, Drasco & Positan, LLC (incorrectly pleaded as Lum Drasco Positan), Steven Eisenstein (incorrectly pleaded as Stephen Eisenstein), and Wayne Positan.  (ECF No. 113.)

- A motion to dismiss the first Amended Complaint filed by Defendants Steven Wielkotz, Mathew Wiekotz and Wiekotz & Company, LLC.  (ECF No. 118.)

- A motion to dismiss the first Amended Complaint filed by Defendants Stavola Construction Materials and Elizabeth Stavola.  (ECF No. 142.)

- A motion to dismiss the first Amended Complaint filed by Defendants DI Group Architecture and Vincent Myers.  (ECF No. 146.)

- A motion to dismiss the first Amended Complaint filed by Defendants Levinson Axelrod P.A. (improperly pled as Levinson Axelrod), Richard Marcolus, Christopher DeAngelo, Michael Fusco, Kimberly Gozsa, Brett Greiner, and Adam Rothenberg.  (ECF No. 149.)

- A motion to dismiss the first Amended Complaint filed by Defendants, Lynch Law Firm, Lynch Lynch Held Rosenberg, Michael Rosenberg, Erica Avondoglio, Michael T. Buonocore, James Lynch and Neil Weiner.  (ECF No. 177.)

- A motion to dismiss the first Amended Complaint filed by Defendant Riker Danzig, LLP. (ECF No. 179.)

- A motion to dismiss the first Amended Complaint filed by Defendant Robert Ellenport. (ECF No. 245.)

- A motion to dismiss the first Amended Complaint filed by the Defendant Election Fund of Craig J. Coughlin. (ECF No. 252.)

- A motion to dismiss the first Amended Complaint filed by the Defendants, Louis N. Rainone, Craig J. Coughlin, and David L. Minchello. (ECF No. 255.)

## I.    FACTUAL BACKGROUND:

Plaintiff Caleb "Kai" McGillvary is serving a 57-year sentence for first-degree murder. *State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651, at *1-2 (N.J. App. Div. May 12, 2021.) In February 2013, he rose to internet fame as the "hatchet wielding hitchhiker," a moniker he earned by striking Jett Simmons McBride three times over the head with a hatchet after McBride crashed his car into a group of pedestrians and attacked bystanders at the scene. (Amended Complaint ¶¶ 2, 99-100, 129, ECF No. 84.) Three months later, and after gaining media notoriety for viral news interviews and media appearances, Plaintiff was arrested for and ultimately convicted of murdering Joseph Galfy, Jr. – a New Jersey attorney. *State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651, at *1-2 (N.J. App. Div. May 12, 2021.) These events were explored in the documentary entitled The Hatchet Wielding Hitchhiker, available on Netflix. (Amended Complaint ¶¶ 2, 99-100, 129.)

Plaintiff brings this lawsuit against 81 named individual Defendants and eleven unidentified John/Jane Doe or unnamed Defendants. He asserts sixteen claims – including RICO, ADA, *Bivens*, Section 1983, intentional infliction of emotional distress, defamation,

infringement on his First Amendment rights, copyright infringement and retaliation – against many individuals, companies (including Netflix and RawTV), dozens of New Jersey government officials, Governor Murphy, Senator Scutari, New Jersey District Court Judges, members of the New Jersey State Legislature and various groups of Defendants.  (Amended Complaint.) Plaintiff alleged that Defendants engaged in a wide swiping money laundering and bribery scheme in furtherance of providing Robert Menendez with funding for his political campaign. Plaintiff alleged that Defendants' racketing activities improperly influenced Netflix Inc.'s ability to purchase a closed military base in Fort Monmouth County, New Jersey at a price below market value.  As will be discussed in more detail below, the Amended Complaint also makes reference to release of a documentary about Plaintiff, entitled The Hatchet Wielding Hitchhiker. Plaintiff offers The Hatchet Wielding Hitchhiker in support of his defamation and copyright infringement claims.

### A.  The McBride Incident and Plaintiff's Viral Interviews:

Prior to being incarcerated, Plaintiff worked as a traveling troubadour and/or professional street performer.  *People v. McBride*, 2016 Cal. App. Unpub. LEXIS 566, at *22 (Cal. Jan. 27, 2016); https://en.wikipedia.org/wiki/Caleb_Lawrence_McGillvary.  On February 1, 2013, Plaintiff was involved in a violent incident while hitchhiking with a man named Jett Simmons McBride in Fresno County, California.  (Amended Complaint ¶ 2.)  The two men were traveling together after McBride had offered Plaintiff a ride.  *McBride*, 2016 Cal. App. Unpub., at *18. McBride – who was under the influence of marijuana that was allegedly supplied by Plaintiff and seemingly having a mental health crisis – drove his car into a group of power line workers.  *Id.* at *17.  McBride then exited the vehicle and began attacking a man whom he had hit with the automobile as well as a woman who was attempting to provide aid to the individual who had

been struck by McBride's automobile.  (Amended Complaint ¶ 2.)  Plaintiff thwarted the attack

by striking McBride over the head three times with his camping hatchet.  (*Id.*); *McBride,* 2016

Cal. App. Unpub., at *21.  Plaintiff was not charged with any crimes related to bludgeoning

McBride.  (Amended Complaint ¶ 2.)

Plaintiff was leaving the scene when he was stopped by a reporter and camera operator

from KMPH Fox News.  (*Id.*)  The KMPH journalist proceeded to interview Plaintiff about the

incident, and Plaintiff described the events that had occurred which included his use of a hatchet

to subdue McBride.  (*Id.*)  The interview went viral with Plaintiff's colorfully recounted

interactions with McBride, stating that he smashed McBride over the head three times with his

camping hatchet.  (*Id.*)

### B.  Plaintiff's Murder Conviction on May 30, 2019, and Habeas Corpus Petition:

A few months after he shot to fame, Plaintiff murdered a 74-year-old man in the state of

New Jersey on May 12, 2013.  *State v. McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub.

LEXIS 1651, at *1-2 (N.J. App. Div. May 12, 2021.)  On May 16, 2013, Plaintiff was arrested

for the murder of New Jersey attorney Joseph Galfy, Jr. after Galfy was found "beaten to death,

lying face-down on his bedroom floor."  *McGillvary*, 2021 N.J. Super. Unpub. LEXIS 1651, at

*1.  Plaintiff was convicted of first-degree murder, and on May 30, 2019, received a 57-year

sentence that he is currently serving in a New Jersey prison.  *Id.*; *McGillvary v. New Jersey*, 142

S. Ct. 1685 (2022) (denying cert.).

Plaintiff filed a direct appeal from his criminal conviction to the Superior Court of New

Jersey, Appellate Division, in which he raised eight alleged errors on appeal.  (*State v.

McGillvary*, No. A-4519-18, 2021 N.J. Super. Unpub. LEXIS 1651; affirmed *McGillvary v. New

Jersey*, 142 S. Ct. 1685 (2022).  Plaintiff exhausted his direct appellate rights after his appeal was

formally closed.  Plaintiff then filed a Habeas Corpus Petition on June 22, 2022.  *McGillvary v. Davis*, No. 22-cv-4184-CPO (Plaintiff's Habeas Petition filed at ECF No. 1).  Plaintiff's Habeas Petition takes the form of a collateral attack on the criminal legal proceedings that led to his conviction in the state of New Jersey.  *Id.*

In his Habeas Petition, Plaintiff asserts two distinct legal errors that he alleges the trial court committed during his criminal murder trial.  *Id.*  First, Plaintiff asserts that the trial court erroneously denied his right to self-representation.  *Id.* page 8.  Second, Plaintiff asserts that the trial court erroneously denied his *pro se* Brady motion without a full and fair hearing.  *Id.* pages 8-15.  Under the first ground for habeas corpus relief, Plaintiff asserts that "the trial court's January 7, 2019, denial of [his] Sixth Amendment right to self-representation was a structural error requiring reversal of [his] conviction through writ of habeas corpus."  *Id.* page 8.  Under the second ground for habeas corpus relief, Plaintiff asserts that the "trial court erred in denying his "*pro se* motion to remedy the destruction of Brady materials" which "deprived [him] of his due process and confrontation rights, in violation of the 5th, 6th, and 14th Amendments[.]"  *Id.* page 11.

Plaintiff's Habeas Petition was assigned to the Honorable Christine P. O'Hearn.  *McGillvary v. Davis*, No. 22-cv-4185-CPO.  Plaintiff filed several motions, including a motion to recuse the presiding Judge O'Hearn, on December 1, 2023.  *McGillvary v. Davis,* No. 22-cv-4185-CPO (Motion to Recuse filed at ECF No. 32 in the habeas corpus action).  On December 11, 2023, in the case *sub judice*, Plaintiff filed a motion to recuse the Honorable Renee Marie Bumb, Chief Judge in the New Jersey District Court.  (Motion to Recuse, ECF No. 3.)  Plaintiff's various recusal motions were based on the fact that he had sued multiple federal District Court of

New Jersey judges as named Defendants in this action including Judge O'Hearn and Judge Bumb.  (Motions to Recuse.)

On January 2, 2023, Third Circuit Chief Judge Michael A. Chagares entered an Order reassigning the case *sub judice* to this Court (Order, ECF No. 5.)  Thereafter, on January 9, 2024, Judge O'Hearn administratively terminated Plaintiff's habeas corpus action pending the resolution of the case *sub judice*.  Judge O'Hearn's Order specifically marked Plaintiff's habeas corpus action "closed until and unless the Court enters an Order reopening the matter."  *David v. Davis,* No. 22-cv-4185-CPO (Judge O'Hearn's Order granting administrative termination entered in the habeas action at ECF No. 36.).

**C.  The Documentary – The Hatch Wielding Hitchhiker:**

On or about December 13, 2022 or January 10, 2023, Netflix released the documentary The Hatchet Wielding Hitchhiker, which investigates Plaintiff's upbringing, his viral fame, and ultimately his conviction for murdering Galfy.  (Amended Complaint ¶¶ 129, 130, 134.)  Plaintiff asserts various legal theories of defamation of character in connection with the release of the documentary.  (Amended Complaint ¶¶ 129-130.)  Plaintiff alleges, *inter alia*, that the documentary unfairly took into account the version of events advanced by the Union County Prosecutor's Office which had charged him with the murder of Galfy.  (*Id.*)  Plaintiff also alleges that the documentary unfairly portrayed events surrounding his February 2013 roadside incident with McBride.  (*Id.*)  The documentary is also the factual basis for Plaintiff's copyright infringement claim.  (*Id.* ¶¶ 99, 133.)  Plaintiff cites to various artistic works that he purportedly created which he alleges were misappropriated by Defendants Netflix and RawTV.  (*Id.* ¶¶ 133, 134.)

### D.  Sale of Fort Monmouth, New Jersey to Netflix, Inc.:

Throughout the Amended Complaint, Plaintiff makes reference to the sale of a parcel of land located in Fort Monmouth, New Jersey.  (Amended Complaint.)  It would appear that after several years of negotiations, Defendant Netflix, Inc., entered into an agreement to purchase a parcel of public land that was nearly 300 acres in size which had been used as a military base in Fort Monmouth County, New Jersey.  https://www.njeda.gov/njeda-board-designates-netflix-as-a-studio-partner-continuing-new-jerseys-film-industry-momentum/ (last visited on Jul 14, 2024).  Netflix intends to build a state-of-the-art production studio on the ground that was once used as a military base.

In opposition to Plaintiff's motion, Defendants come forward with an affidavit prepared by Kara Kopach, the executive director of Fort Monmouth Economic Revitalization Authority (FMERA).[3]  (Kopach Affidavit, ECF No. 167-2.)  Mr. Kopach avers that the parcel of land was appraised at $55.4 million dollars by a licensed professional appraiser.  (*Id.* ¶18.)  Ms. Kopach also establish a final closing price nearly equivalent to the appraised value at Fifty-Five Million ($55,000,000.00).  (*Id.* ¶26.)

In this action, Plaintiff seeks to enjoin (or rescind) the sale of the mega parcel of land to Netflix, Inc., based on the theory that the land is being sold at a price below market value in connection with a bid rigging scandal.  (Amended Complaint ¶¶ 99, 101, 132, 141.)  Plaintiff also alleges that the redevelopment plan was adopted and approved despite the fact that it failed to meet certain constitutional and legal requirements like, for example, providing for lower-

---

[3] FMERA is a New Jersey government authority created by the New Jersey legislature pursuant to authorization under P.L. 2010, c. 51 (N.J.S.A. 52:271-18 et seq).  (*Id.* ¶2.)  The scope of FMERA's authority and mandate are governed by its enabling Act, N.J.S.A. 52:271-18 to 52:271-41 and its rules, New Jersey Administrative Code, N.J.A.C. 19:31C-1.1 to 19:31C-3.28 ("regulations").  (*Id.* ¶2.)  FMERA's general mission pursuant to N.J.S.A. 52:271-24 is planning and implementing the redevelopment and reuse of Fort Monmouth, formerly operated as a United States Army Installation.

income housing.  Plaintiff alleges that the Netflix land transaction and revitalization plan was part of a larger conspiracy which Plaintiff refers to in the pleadings as a bid rigging scandal.  It would appear under Plaintiff's narrative of events that he uncovered a broad reaching bid rigging scandal involving public officials, politicians and judges located in New Jersey who committed various illegal acts of corruption, misconduct and impropriety which included improper campaign contributions and money laundering.  (*Id.*)

> **E.  Factual Allegations in the First Amended Complaint Directed Towards Moving Defendants Who Filed Motions to Dismiss Identified Hereinabove**:

Count One of the First Amended Complaint asserts that moving Defendants are among a number of persons and entities engaged in "straw donor activities" or otherwise engaged in activities in violation of 18 U.S.C. § 1956 for purposes of "influencing the approval of bids for contracts and sale of public resources." (Amended Complaint ¶94.)  Plaintiff refers to moving Defendants collectively as the "Money Laundering Network". (*Id.*)  The moving Defendants are then alleged to have been invited to a testimonial affair believed to have been at or near Citi Field in Queens, New York on September 10, 2021.  (*Id.* at ¶101.)

Plaintiff then alleges that the Money Laundering Network agreed to join a bid rigging conspiracy at the aforementioned testimonial affair.  (*Id.* at ¶ 102.)  Plaintiff appears to allege that the referenced agreement was in furtherance of a claimed "bid rigging syndicate" related to the sale of "the Fort Monmouth Mega Parcel Sale for Netflix" in consideration for its production of "the Hatchet Wielding Hitchhiker." (*Id.* at ¶¶ 92, 99 & 102.)  With the exception of Defendants Riker Danzig, LLP, New Jersey Association of Justice, and New Jersey Association of Justice PAC, Plaintiff alleges that Defendants made political contributions to the Candidate Committee of Nicholas Scutari – a New Jersey state senator.  (*Id.* at ¶125.)  Plaintiff alleges that on various dates between September 2021 and October 2022 each of the moving Defendants made an

individual political contribution or contributions to the Candidate Committee of Defendant Nicholas Scutari. (*Id.*) These contributions to the Candidate Committee of Defendant Nicholas Scutari ranged in amounts from $884 to $2,600.[4] Plaintiff further alleges that these political contributions were structured to avoid the reporting requirements of N.J.S.A. 19:44A-8(b)(1), and N.J.A.C. 19:25-10. (*Id.*) Plaintiff concludes by stating that these donations violated 18 U.S.C. § 1956, a predicate act for the alleged racketeering activity, in furtherance of the alleged enterprise. (*Id.*)

With specific reference to Defendant Riker Danzig, LLP, Plaintiff does not appear to allege that it made political donations to the Candidate Committee of Defendant Nicholas Scutari. Rather, Plaintiff alleges that it was invited to the "testimonial affair believed on information to be at or near City Field in Queens, NY on 9/10/21." (*Id.* ¶101). He further alleges that "on a date and time which will be determined through discovery," it was to have met with other Defendants and agreed to "participate in a sham-bid process in which Netflix was pre-selected for approval by the bid approval committee. . ." (*Id.* ¶109.) Plaintiff also alleges that it held in escrow certain "deposit fees" relating to the Mega Parcel Request for Offers to Purchase, (*id.* ¶¶ 110, 117), and that it executed the Purchase and Sale and Redevelopment Agreement with Netflix. (*Id.* ¶135.) In regards to Defendants New Jersey Association of Justice and New Jersey Association of Justice PAC, Plaintiff alleges that its members donated to the Scutari campaign. Outside of these allegations, Plaintiff lumps Defendants Riker Danzig, LLP, the New Jersey Association of Justice and the New Jersey Association of Justice PAC, in with two groups of individuals and entities which he refers to as the "NJAJ Money Launderers" and the "FMERA

---

[4] Plaintiff alleges Defendants Elizabeth Stavola and Stavola Construction Materials collectively made donations totaling in the amount of either $3,500 or $4,500. Plaintiff makes no allegation that political contributions were made by Riker Danzig, LLP, New Jersey Association of Justice, and New Jersey Association of Justice PAC.

Officers," which, as a group, in turn apparently joined the Bid Rigging Syndicate Conspiracy." (*Id.* ¶¶ 92, 109.)

Plaintiff further adds numerous paragraphs within the first Amended Complaint that attempt to allege proximate causation. Plaintiff makes the conclusory allegation that, "Here, as a direct and proximate result of moving Defendants' actions . . . Plaintiff was deprived of his revenues from his copyrights to his works[.]" (*Id.* at ¶ 161.) Plaintiff also alleges, through several paragraphs, each beginning with the conclusory language that he suffered varying and undeterminable damages as a result of the alleged conspiracy and pattern of racketeering activity described in paragraphs 92-182 of the first Amended Complaint. (*Id.* at ¶¶ 174-182.)

### F. Alleged Money Laundering Network:

Plaintiff alleges that the "Money Laundering Network", through Defendant Romankow, used its members to "offer benefits as consideration to public officials" such that the public officials would then allow Defendant Netflix to buy a tract of land below its market-value. (*Id.* ¶99.) This was allegedly so that Defendants Romankow and Ellenport could "exercise control over the narrative of the documentary film[.]" (*Id.*) Specifically, Plaintiff alleges that Romankow used the "Money Laundering Network" so that he could make false statements, "with actual malice[,]" in the documentary which the Plaintiff asserts constitutes a predicate act. (*Id.*) Plaintiff asserts that in early September there was a meeting where this conspiracy was created whereupon it was determined that Romankow would utilize the "Money Laundering Network." (*Id.* at ¶101.) Plaintiff then asserts that some of the Defendants who were members of the "Money Laundering Network" attended a meeting at Citi Field. (*Id.* at ¶102.)

Plaintiff claims that there was a "Second Request for Offers to Purchase" meeting, "on a date and time to be ascertained though discovery" whereupon Romankow again agreed to use the "Money Laundering Network" to aid Netflix in buying a tract of land below market-value.  (*Id.* ¶111.)  Plaintiff alleges that, between October 2021 and October 2022, Romankow used the "Money Laundering Network" to donate to Scutari, Phil Murphy, and certain "FMERA Officers".  (*Id.* at ¶¶111-114.)  Plaintiff alleges that Romankow, sometime in October 2022, again used the "Money Laundering Network" to contribute to Scutari's campaign so that he could persuade Phil Murphy and FMERA Officers "to execute a Purchase and Sale and Redevelopment Agreement with Netflix for the Mega Parcel." (*Id.* at ¶118.)

Plaintiff alleges that the "Money Laundering Network" is an association in-fact, sufficient to meet the definition of an enterprise under the Racketeer Influence and Corrupt Organization Act (RICO).  (*Id.* at ¶139. (citing *Boyle v. U.S.*, 556 U.S. 938, 948-49 (2009).)  Plaintiff asserts that he is entitled to civil RICO treble damages from the "Money Laundering Network." (*Id.* at ¶150.)  Plaintiff claims that he "suffered damages of at least $903,000,000," prior to the application of treble damages, based on the cost of the consideration allegedly used to deprive Plaintiff "of the revenues from use of his copyrighted works." (*Id.* at 161, 162, 174.)

The Plaintiff mentions the "Money Laundering Network" several times in paragraphs in and around ¶246 (Count Ten), ¶251 (Count Eleven), ¶268 (Count Thirteen), and ¶293 (Count Sixteen).  These are noted separately because Plaintiff invokes the "Money Laundering Network" to intertwine John/Jane Does 1-3, along with the District Judge Defendants, in the realm of the alleged Bid Rigging Syndicate Enterprise.  There are no new allegations regarding the "Money Laundering Network", but simply the allegation that the John/Jane Does and the

Judges worked with the "Money Laundering Network" and the other alleged enterprises.  (*Id.* (Counts Ten, Eleven, Thirteen & Sixteen).)

For example, within Count Ten, a deprivation of First Amendment rights claim, (*id.* pp. 106-08), Plaintiff states that "Jane Doe 1, would be offered the benefit of monies and career advancement opportunities by Romankow and Scutari, and the BRS Conspirators, Money Laundering Network, and NJAJ Money Launderers . . . for her nonperformance of the act of filing and addressing Plaintiff's petition."  (*Id.* at ¶246.)  Besides this conclusory statement, Plaintiff fails to elaborate how Jane Doe 1 is related to the moving Defendants purportedly involved with the "Money Laundering Network."

Count Eleven sets forth another federal RICO claim in which Plaintiff appears to allege that the NJAJ Money Launderers bribed Jane Doe 1 so that she would refuse to file Plaintiff's petition challenging FMERA's amendment.  (*Id.* ¶¶ 251- 257.)  Within Count Eleven, (*id.* at p. 108), Plaintiff relies on the alleged constitutional deprivation referenced in Count Ten to act as a RICO predicate act and groups in the "Money Laundering Network" along with other alleged conspiracy groups, although the majority of the Count focuses on Jane Doe 1.  This pattern, of asserting a constitutional violation in the first Count followed by a RICO violation that predicates upon the alleged constitutional violation, is repeated two more times against Jane Doe 2, John Doe 3, and the Defendant Judges.  Plaintiff alleges that he would not have been injured if his petition had proceeded.  (*Id.* ¶257.)  Plaintiff seeks damages, including treble damages and costs of suit.  (*Id.* ¶ 316.)

In Count Twelve, Plaintiff again alleges deprivation of State and Federal constitutional rights.  (*Id.* ¶¶ 258-266.)  Plaintiff claims that he sought to file a complaint in lieu of prerogative writs both challenging and seeking to void the sale of the Mega Parcel to Netflix.  (*Id.* ¶259.)

Plaintiff asserts that, instead of filing the complaint, a Jane Doe 2 forwarded Plaintiff's filing to the Appellate Division and a John Doe 2 sent an alleged "threatening notice", stifling Plaintiff's refiling of the complaint in the correct venue, to Plaintiff's detriment.  (*Id.* ¶¶ 262-263.)  Plaintiff claims that he was generally damaged by the failure of the New Jersey State Courts to grant his relief.  (*Id.* ¶317.)

Count Thirteen sets forth another federal RICO claim asserting a conspiracy among the NJAJ Money Launderers and other Defendants to bribe Jane Doe 2 and John Doe 2 to prevent the filing of Plaintiff's complaint in lieu of prerogative writs.  (*Id.* ¶¶ 268-277.)  Plaintiff claims he was injured through loss of monies associated with filing and preparing the complaint and his wages for his time.  (*Id.* ¶277.)  Plaintiff also seeks treble damages. (*Id.* ¶318.)

Count Sixteen sets forth another federal RICO claim alleging a conspiracy among the NJAJ Money Launderers and other Defendants for refusing to file another of Plaintiff's complaints in the federal courts in alleged retaliation for Plaintiff's having brought this litigation. (*Id.* ¶¶ 293-299.)  Plaintiff claims he was injured through loss of monies associated with filing and preparing the complaint and his wages for his time, and also seeks treble damages.  (*Id.* ¶¶ 299, 321.)

## II.    LEGAL STANDARD:

A Motion to dismiss pursuant to Rule 12(b)(1) challenges the existence of a federal court's subject matter jurisdiction.  When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion.  *Kehr Package, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Schneller ex rel. Schneller v. Crozer Chester Med. Ctr.*, 387 F. App'x 289, 292 (3d Cir. 2010) (citing *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993)).  In reviewing a motion brought pursuant to rule 12(b)(1), the Court should

determine whether the motion presents a facial or factual challenge.  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014).  A motion to dismiss for lack of subject matter jurisdiction may either "attack the complaint on its face . . . [or] attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings."  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists.  *Mortensen*, 549 F.2d at 891; *see also Cardio-Med. Assocs. Ltd. v. Crozer-Chester Med. Ctr.*, 721 F.2d 68, 75 (3d Cir. 1983).  A factual attack under Rule 12(b)(1) challenges the very power of a district court to hear a case, independent of the pleadings.  *Mortensen*, 549 F.2d at 891.

When evaluating a factual challenge, a court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.*  Unlike a facial attack, no presumption of truth attaches to the plaintiff's allegations in a factual challenge and "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Id.*  Furthermore, in a factual challenge, the plaintiff bears the burden of establishing that jurisdiction exists.  *Id.*  The district court is not required to convert a motion to dismiss for lack of subject matter jurisdiction into a motion for summary judgment merely because the court considers evidence outside the complaint.  *Medica v. City of Philadelphia*, 219 F. App'x 169, 172 (3d Cir 2007).

The standard for a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is examined in detail in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  After *Iqbal*, it is clear that

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim [for] relief that is plausible on its face.'" *Tatis v. Allied Interstate*, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Thus, this Court must examine Plaintiff's claims to determine whether it can infer that Defendants are liable for the alleged misconduct.

## III.    DISCUSSION:

Plaintiff lacks Article III Constitutional standing to pursue Racketeer Influence and Corrupt Organization Act claims asserted under federal law and New Jersey state law (collectively referred to as "RICO" claims.) Therefore, Plaintiff's RICO based claims will be dismissed under Fed. R.C.P. 12(b)(1). Should an appellate court reject the position taken by this Court on the issue of Article III standing and the absence of federal subject matter jurisdiction, Plaintiff's RICO claims are equally deficient under Fed. R.C.P. 12(b)(6). Finally, any potential claim that Plaintiff seeks to assert under the First Amendment or New Jersey Civil Rights Act fails because moving Defendants are private actors not operating under color of law.

### A. Plaintiff Lacks Article III Standing to Pursue His RICO Claims:

The Court lacks subject matter jurisdiction to hear Plaintiff's RICO based claims because Plaintiff has not established Constitutional Article III standing to bring RICO claims against the

16

moving Defendants.  Article III standing is jurisdictional.  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  The Court must be satisfied that the plaintiff meets the fundamental jurisdictional requirement that he has standing to sue.  *Id.* (citing Raines v. Byrd, 521 U.S. 811, 818 (1997)); see also *Joint Stock Soc'y v. UDV N. Am. Inc.*, 266 F.3d 164, 173 (3d Cir. 2001). Article III of the Constitution limits the power of federal courts to "cases" or "controversies". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  This entails the following analysis:

> Over the years, our courts have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact" - an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560.

The injury-in-fact requirement means that the harm claimed must be "particularized," that it affects the plaintiff personally.  *Id.* at 561 n.1.  "[T]he 'injury-in-fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured."  *Id.* at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-735 (1972)).

Plaintiffs who file suit in federal court bear the burden of establishing standing.  *Lujan*, 504 U.S. at 561; see also *Warth v. Seldin*, 422 U.S. 490, 508 (1975).  They must support each of the three elements set forth above to establish standing.  *Id.*  The Court must review, at this stage, the plaintiff's allegations of injury resulting from the defendants' conduct.  *Id.*  To do so, the Court applies the standard of reviewing the Complaint's sufficiency under F.R.C.P. 8(a).

*Twombly*, 550 U.S. at 573.  The Complaint must also be held to the plausibility standard.  *Id.* at 570.

Determining whether "concrete and particularized injury-in-fact" is supported by a complaint's factual allegations, the Court must evaluate the injury claimed by virtue of each source of relief asserted.  *Lujan*, 540 U.S. at 560.  The injury must be "an invasion of the legally protected interest."  *Id.*; see also *Bennett v. Spear*, 520 U.S. 154, 162 (1997) ("a plaintiff's grievance must arguably fall within the zone interest protected or regulated by the statutory provision or constitutional guarantee invoked in the suit").  Constitutional standing requires that the injury be causally linked to some action or conduct by the defendants fairly attributable to their wrongdoing.  *In re Schering - Plough Corp.*, 2010 U.S. Dist. LEXIS 56621, at *19 (D.N.J. June 9, 2010).

Under this standard it is apparent that Plaintiff lacks constitutional standing for his claims against moving Defendants.  With the exception of Defendants Riker Danzig, LLP, New Jersey Association of Justice, and New Jersey Association of Justice PAC, Plaintiff's sole allegation against moving Defendants relates to the fact that they made political donations to the Candidate Committee of Nicholas Scutari.[5]  Plaintiff further alleges that moving Defendants were invited to and might have attended an event at or near Citi Field.  Plaintiff does not specify any unlawful activity at all on the part of moving Defendants despite alleging in a conclusory fashion that they were involved in a RICO enterprise.  (Amended Complaint ¶91.)  Plaintiff provides no connection whatsoever between lawful activities, by way of association and political contributions, and any injury to Plaintiff.  Indeed, a careful review of Plaintiff's prayer for relief

---

[5] Plaintiff makes no allegation that political contributions were made by Riker Danzig, LLP, which is allegedly to have held money in escrow.  Plaintiff alleges that Defendants who were members of New Jersey Association of Justice, and New Jersey Association of Justice PAC, made political contributions to the Scutari campaign.

reveals no specific request for relief against any of the individual moving Defendants. Rather moving Defendants are lumped with all others by way of Plaintiff's request for "retribution and/or compensatory damages". (Amended Complaint ¶¶166-172, 306.)

There is no plausible allegation or connection whatsoever between moving Defendants and Plaintiff. As will be explained in more detail below, to the extent that Plaintiff asserts in a conclusory fashion that political contributions were done in violation of law, he has failed to establish that he was damaged by virtue thereof. In sum, Plaintiff has failed to meet the *Lujan* standards for establishing constitutional standing related to his claims against moving Defendants. He has not established that he suffered a concrete and particularized injury-in-fact that can be fairly traceable to the allegedly improper conduct committed by moving Defendants. Finally, Plaintiff has not established, beyond mere speculation, that any injury will be redressed by a decision in his favor and against moving Defendants.

Plaintiff cannot establish Article III constitutional standing. Accordingly, allegations asserted against moving Defendants will be dismissed from the first Amended Complaint under Fed. R.C.P. 12(b)(1) by virtue of this Court's lack of subject matter jurisdiction. Plaintiff will not be permitted to filed an amended complaint to renew claims against moving Defendants because amendment would be futile.

When a motion to dismiss is granted, the Court must decide whether to grant leave to amend. The Third Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. See, e.g., *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000); *Dole v. Arco Chem. Co.*, 921 F.2d 484, 486 (3d Cir. 1990). However, a court need not grant leave to amend when it would be an exercise in futility. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879, 69 V.I. 1034 (3d Cir. 2018) ("Leave to amend is properly

denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss.'") (quoting *Jablonski v. Pan. Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988)); see also *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile).

Since defects in Plaintiff's pleadings cannot be cured with further amendment, all RICO claims asserted in this lawsuit against moving Defendants will be dismissed with prejudice and without leave to amend. See *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 879, 69 V.I. 1034 (3d Cir. 2018)* ("Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss'").

### B. Plaintiff's Civil RICO Claims under Federal and New Jersey Law Can Be Dismissed for Failure to State a Claim under Fed. R.C.P. 12(b)(6):

The RICO claims asserted by Plaintiff fail to withstand Fed. R.C.P. 12(b)(6) analysis even if an appellate court were to determine federal subject matter jurisdiction exists. Plaintiff asserts claims under the federal Racketeer Influence and Corruption Organization Act, 18 U.S.C. § 1962, and the state of New Jersey Racketeer Influence and Corrupt Organization Act, NJSA 2C:4-1 (collectively referred to as "RICO"). Because the New Jersey RICO statute mirrors the Federal RICO statute, the Court will analyze both claims together. *Cetel v. Cmmw. Life Ins. Co.*, 460 F.3d 494, 510 (3d Cir. 2006) ("[T]he New Jersey Supreme Court believe[s] the New Jersey RICO statute was and should be consistent with the federal RICO statute."). To establish a federal RICO claim under Section 1962(c), a plaintiff must plausibly allege: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Miller v. Pocono Ranch Lands Prop. Owners Assn.*, 557 Fed. Appx. 141, 145 (3d Cir. 2014) (quoting *Sedima, S.P.R.L. v. Imrex*

*Co.*, 473 U.S. 479, 496 (1985)); *RJR Nabisco, Inc. v. Eur. Cmty.*, 571 U.S. 325, 354, 2111, n.1 (2016); *see also* Section 1962(d) (making it unlawful to conspire to violate Section 1962(c)).

A Plaintiff in a civil RICO case must also establish standing under the RICO act. RICO standing, meaning that the "RICO predicate offense not only was a 'but for' cause of [their] injury, but was the proximate cause as well." *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir. 2020) (RICO standing is "distinct from Article III standing").

RICO standing is satisfied where there is "some direct relationship" between the plaintiff's injury and the defendants' racketeering acts. *Amos v. Franklin Fin. Servs. Corp.*, No. 10-1285, 2011 WL 5903875, at *6 (M.D. Pa. Nov. 22, 2011), *aff'd*, 509 F. App'x 165 (3d Cir. 2013). Thus, a plaintiff lacks RICO standing where their injury is "derivative" of the injury suffered by a more immediate victim of the defendants' racketeering acts. *Gratz v. Ruggiero*, 822 F. App'x 78, 82, n.3 (3d Cir. 2020) (citations omitted); *see also Lancaster Gen. Hosp.*, 967 F.3d at 301 ("To demonstrate some direct relation between the injury asserted and the injurious conduct alleged, the [injury] alleged must not be purely contingent on another.").

To establish standing for a civil RICO claim, a plaintiff must also show he suffered an injury to business or property and that the injury was proximately caused by the defendant's racketeering activities. *Miller*, 557 Fed. Appx. at 145; see also *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). A RICO plaintiff must make two related but analytically different threshold showings to have standing "(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by defendant's violation of 18 U.S.C. § 1962." *Maio*, 221 F.3d at 483; see also *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994); see also *Brokerage Concepts, Inv. v. US Healthcare, Inc.*, 140 F.3d 494, 520-521 (3d Cir. 1998) (addressing § 1964(c)'s proximate cause requirement in

standing analysis).  Besides the proximate cause requirement, a RICO plaintiff must incur out-of-pocket expenses as a result of the defendant's conduct.  *Maio*, 221 F.3d. at 483-484.

### B.1.    Plaintiff Fails to Aver Facts to Establish that he has Standing as Defined by the New Jersey or Federal RICO Statutes:

Plaintiff fails to assert sufficient allegations to support statutory RICO standing to pursue claims.  (See Amended Complaint.)  A RICO violation must be the proximate cause of the plaintiff's injury.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).  This requirement means the plaintiff must allege "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  A mere "but for" cause of injury does not establish a RICO claim.  *Id.*

It is impossible to discern how the Plaintiff was injured, or that any alleged injury was proximately caused by virtue of moving Defendants' alleged conduct.  (Amended Complaint.)  There is nothing in the alleged conduct of moving Defendants that is traceable, much less proximately causing, any injuries to Plaintiff.  (*Id.*)  The Plaintiff does not make any such connection.  (*Id.*)  Moreover, the Plaintiff's generalized allegations as to injury in business are not traceable to moving Defendants.  Accordingly, Plaintiff has not established statutory RICO standing in the claims asserted against moving Defendants.

Plaintiff's Amended Complaint identifies no concrete financial loss associated with his RICO claims.  In Count One, Plaintiff claims to have been injured in two ways.  First, he alleges that Netflix, as part of the alleged RICO enterprise, "[willfully] copied, displayed, broadcast, and made derivative works from; the following of Plaintiff's works without authorization for the purposes of commercial advantage or private financial gain" in violation of Plaintiff's copyrights in four works, thus "damaging Plaintiff in his property interest therein . . . and depriving him of his entitled monies from revenues therefrom[.]"  (Amended Complaint ¶¶133, 174.)

Plaintiff alleges no actual loss, and thus has no RICO standing, in connection with any alleged copyright infringement. *Clark v. Conahan*, 737 F. Supp. 2d 239, 255 (M.D. Pa. 2010) ("[A]llegations of lost earnings and/or decreased earning capacity is not sufficient to support a civil RICO claim."). At best, Plaintiff's allegations are akin to a claim for lost profits, which are cognizable only if they are "not remote or speculative" and can be described with "concreteness." *Spencer Forrest, Inc. v. Folica, Inc.*, 2008 U.S. Dist. LEXIS 130209, at *16 (D.N.J. June 27, 2008); *see also Parker v. Learn the Skills Corp.*, 530 F. Supp. 2d 661, 678 (D. Del. 2008) ("general allegations of lost sales" with "no specifics" did not confer RICO standing). However, Plaintiff fails to plead clear, concrete, ascertainable loss of profits.

Plaintiff's second category of claimed injury to business or property is, in essence, a claim to recover the costs of litigation. While RICO contains a fee-shifting provision, other (proper) RICO damages must exist before legal fees can be considered. Legal fees in the RICO action "cannot form the basis for RICO liability." *The Knit With v. Knitting Fever, Inc.*, 2012 U.S. Dist. LEXIS 100368, at *14 (E.D. Pa. July 19, 2012) (quoting *Walter v. Palisades Collection LLC*, 480 F. Supp. 2d 797, 805 (E.D. Pa. 2007)). Litigation expenses such as filing fees are also insufficient to establish injury in RICO litigation. "[T]he cost of filing a RICO action does not satisfy the concrete financial injury requirement." *Martinez v. Quality Loan Serv. Corp.*, 2009 U.S. Dist. LEXIS 21920, at *25 (C.D. Cal. Feb. 10, 2009) (citing *Walter*, 480 F. Supp. 2d at 805). Plaintiff is simply incapable of establishing RICO standing by averring injury through incurring legal fees, filing fees, paper, postage, packing materials, copying costs, "travel expenses and expert witness consultation expenses regarding this matter with Arthur Steven Chancellor," and/or the costs of an "interview with Chancellor's paralegal." (Amended Complaint ¶¶ 177-181.) The same is true of any legal, copying, or postage costs associated with

his request for pre-suit depositions concerning the allegations in this case. (*Id.*, Exhibit J., ¶¶ 285, 299.)

Similarly, Plaintiff's alleged postage, copying, or legal costs for various other public record requests, petitions, or court filings concerning the subject matter of this case do not confer RICO standing. (Amended Complaint ¶¶ 176, 245, 257, 277.) "[D]amages incurred by a direct target [of the conspiracy] in investigating and mitigating damages are generally not deemed direct injury flowing from a defendant's illegal conduct." *The Knit With*, 2012 U.S. Dist. LEXIS 100368, at *20; *see also McDonald v. Schencker*, 18 F.3d 491, 498 (7th Cir. 1994) ("[Plaintiff] alleges that, as a proximate consequence of [defendant's] bad acts, [defendant] set in motion a series of routine and foreseeable uses of the U.S. mails, including . . . the filing of the present RICO action, all of which extend indefinitely into the future. This is absurd.").

A review of the record establishes that the Plaintiff has failed and cannot establish actual injury to his business or property. Therefore, Plaintiff is unable to establish standing as defined by both the New Jersey and Federal RICO statutes. Under the circumstances, it is appropriate to dismiss Plaintiff's RICO claims for failure to plead a claim under Federal Rule of Civil Procedure 12(b)(6).

**B.2.    Conduct of an Enterprise through a Racketeering Activity:**

Plaintiff fails to plead facts to establish other necessary elements of a civil RICO claim. Returning to the initial four elements of a predicate RICO offense as previously mentioned hereinabove, a plaintiff must plausibly allege: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Miller v. Pocono Ranch Lands Prop. Owners Assn*., 557 Fed. Appx. 141, 145 (3d Cir. 2014) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

An "enterprise" as defined by statute includes: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Thus, an "association-in-fact" RICO enterprise requires three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) ("[T]he very concept of an association in fact is expansive[,]" in keeping with RICO's directive that "its terms are to be liberally construed to effectuate its remedial purposes."). Further, an association-in-fact enterprise must function distinctly from the persons who allegedly conducted the racketeering activity of that enterprise. *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 77 (E.D.N.Y. 2011) (noting that "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)").

The pattern element requires a showing of criminal conduct characterized by "continuity plus relationship." *Sedima, S.P.R.L.*, 473 U.S. at 496 n.14. In other words, the pattern of racketeering activity requires more than one racketeering activity and the threat of continuing activity to be effective. *Superior Oil Co. v. Fulmer*, 785 F.2d 252, 257 (8th Cir. 1986). A defendant's involvement in an enterprise must also be accomplished "through a pattern of racketeering activity" for criminal liability under RICO. N.J.S.A. 2C:41–2c. A "pattern of racketeering activity," according to N.J.S.A. 2C:41–1d, requires: "(1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity." *State v. Ball*, 141 N.J. 142, 163 (1995). A civil RICO Plaintiff under 18 U.S.C. § 1961(5) must plead at least two predicate acts of racketeering activity within a ten-year period to satisfy the "pattern" requirement. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008) ("[N]o showing of reliance is required to

25

establish that a person has violated [RICO] by conducting the affairs of an enterprise through a pattern of racketeering activity").

The Amended Complaint in this matter alleges that the moving Defendants each made a political contribution to the Scutari campaign or held money in escrow. (Amended Complaint p. 65, ¶125.) By its own words, the Amended Complaint fails to allege the factual elements required to establish a "pattern" or two schemes. *Phoenix Fed. S&L Ass'n, F.A. v. Shearson Loeb Rhoades, Inc.*, 856 F.2d 1125, 1128 (8th Cir. 1988), cert. denied, 489 U.S. 1066 (1989) (noting that a RICO plaintiff must prove at least two separate schemes in order to demonstrate that a defendant engaged in a pattern of racketeering activity within the meaning of the RICO statute and finding that a Complaint fails to state a claim that at most alleges a single scheme.).

Plaintiff claims that moving Defendants were invited to or attended a testimonial affair believed to have been at or near Citi Field in Queens, New York. (Amended Complaint ¶101.) Plaintiff further alleges that moving Defendants donated to the Candidate Committee of Defendant Nichols Scutari.[6] (Amended Complaint ¶125.) However, there are no further allegations as to any conduct by moving Defendants apart from the fact that they were invited to attend an event at Citi Field which some of the moving Defendants may have attended and that they made a small political contribution. (*Id.*)

The Plaintiff does not specify any unlawful activity at all on behalf of the moving Defendants. (*Id.*) Plaintiff provides no connection whatsoever between lawful activities, by way of association and political contribution, and any injury to the Plaintiff. *Id.* There is no plausible allegation or connection whatsoever between moving Defendants and the Plaintiff. To the extent

---

[6] Plaintiff makes no allegation that political contributions were made by Riker Danzig, LLP, which is allegedly to have held money in escrow. Plaintiff alleges that Defendants who were members of New Jersey Association of Justice, and New Jersey Association of Justice PAC, made political contributions to the Scutari campaign.

Plaintiff offers conclusory allegations that political contributions were made in violation of law,

he has not asserted how he is damaged by virtue thereof.  Furthermore, making a political

contribution is not an unlawful racketeering activity.  See *Federal Elec. Comm'n v. Colorado*

*Republic Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Contributing to political candidates . . .

fall[s] within the First Amendment's pretention of speech and political associations.").  The

allegedly improper transactions made by moving Defendants would appear to be legitimate

campaign contributions that were reported to and monitored by the New Jersey Election Law

Enforcement Commission.  The statute cited by Plaintiff in the first Amended Complaint,

N.J.S.A.19:44A-8, puts the onus on the candidate's committee – not the donor – to provide

information to the Election Law Enforcement Commission.

The first Amended Complaint not only fails to plead the necessary facts to establish

standing as defined by applicable federal and state RICO statutes, but it also fails to set forth

facts to establish other elements of a RICO claim.  Plaintiff fails to plead facts to establish that

Defendants were members of an enterprise that was engaged in a pattern of criminal racketeering

activities.  Therefore, Plaintiff's RICO claims are properly dismissed under Fed. R.C.P. 12(b)(6).

When a motion to dismiss is granted, the Court must decide whether to grant leave to

amend.  The Third Circuit has a liberal policy favoring amendments and, thus, leave to amend

should be freely granted.  See, e.g., *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000); *Dole v.*

*Arco Chem. Co.*, 921 F.2d 484, 486 (3d Cir. 1990).  However, a court need not grant leave to

amend when it would be an exercise in futility.  *City of Cambridge Ret. Sys. v. Altisource Asset*

*Mgmt. Corp.*, 908 F.3d 872, 879, 69 V.I. 1034 (3d Cir. 2018) ("Leave to amend is properly

denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a

renewed motion to dismiss.'") (quoting *Jablonski v. Pan. Am. World Airways, Inc.*, 863 F.2d

289, 292 (3d Cir. 1988)); see also *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile).

Since defects in Plaintiff's pleadings cannot be cured with further amendment, all claims asserted in this lawsuit will be dismissed with prejudice and without leave to amend.  See *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp., 908 F.3d 872, 879, 69 V.I. 1034 (3d Cir. 2018)* ("Leave to amend is properly denied if amendment would be futile, i.e., if the proposed complaint could not 'withstand a renewed motion to dismiss'").

### C.  Plaintiff Fails to Assert a Viable First Amendment or Civil Rights Claim:

First Amendment and Civil Rights claims asserted against moving Defendants will be dismissed from the first Amended Complaint because Plaintiff fails to aver sufficient facts to support these claims under Fed. R.C.P. 12(b)(6).  Plaintiff will not be permitted to file an amended complaint to renew claims against moving Defendants because, as will be explained in more detail herein below, amendment would be futile.

In Count Ten of the first Amended Complaint, Plaintiff alleges that a Jane Doe Defendant "who is a member of the NJAJ Money Launderers" agreed with Defendants Scutari and Romankow to refuse to file Plaintiff's petition, and in exchange for this Jane Doe receiving "the benefit of monies and career advancement opportunities by Romankow and Scutari, and the BRS Conspirators, Money Laundering Network, and NJAJ Money Launderers" thereby violating Plaintiff's First Amendment rights and/or his rights under the New Jersey Civil Rights Act. (Amended Complaint ¶246.)

"It is axiomatic that the First Amendment governs only state action, not the actions of private entities."  *Max v. Republican Comm. of Lancaster Cty.*, 587 F.3d 198, 200 (3d Cir. 2009).

There is no allegation that moving Defendants are governmental actors, nor is there any allegation that they performed any government function.  All they are alleged to have done is make campaign contributions – something that the government itself does not do.  Whatever First Amendment claim Plaintiff may have, he cannot bring it against the moving Defendants.

Similarly, the New Jersey Civil Rights Act confers a private right of action only upon plaintiffs who suffer deprivation of or interference with their rights "by a person acting under color of law."  N.J.S.A. 10:6-2(c); *see also* N.J.S.A. 10:6-2(a)-(b) (empowering New Jersey Attorney General to bring actions against persons not acting under color of law).  There is no basis on which to find that moving Defendants did anything under color of law.  They are alleged only to have made campaign contributions as private actors.

## IV.    CONCLUSION:

For these reasons, the motion to dismiss filed by moving Defendants will be granted and all allegations in the first Amended Complaint that assert claims against moving Defendants will be dismissed.

**BY THE COURT**:

   /s John Milton Younge
Judge John Milton Younge